**Robert A. REED, et al. Plaintiffs,**

v.

**James A. RHODES, et al., Defendants.**

**No. 1:73 CV 1300.**

United States District Court,
N.D. Ohio,
Eastern Division.

March 27, 1998.

---

Thomas I. Atkins, Brooklyn, NY, James L. Hardiman, Cleveland, OH, Dr. David Whitaker, Beachwood, OH, Michele Roquemore. Comer, Cleveland, OH, for Plaintiffs.

Wanda Arnold, Adrian Thompson, Margaret Cannon, Lisa Marie Ruda, Cleveland, OH, James Tassie, Christopher M. Culley, Ohio Attorney General's Office, Karin Rilley, Ohio Dept. of Education, Columbus, OH, for Defendants.

Richard Alston, Cleveland,OH, for OSM-COR.

## MEMORANDUM AND ORDER

WHITE, Chief Judge.

On July 1, 1997, the Ohio State Board of Education and its Superintendent of Instruction ("State Defendants") and the Cleveland City School District ("District") filed a Motion to Declare that the State Defendants and the Cleveland City School District Have Achieved Unitary Status ("Motion for Unitary Status"). As part of their Motion for Unitary Status, the State Defendants and District ("Defendants") moved this Court to issue an order declaring that the Defendants have achieved unitary status and are released from all further remedial obligations, except those specifically designated in the Consent Decree which continue until July 1, 2000.[1] The Plaintiff Class comprised of African–American students enrolled in the Cleveland Public Schools and their parents or legal guardians and the Cleveland Public Schools' Board of Education ("Board"), opposed the motion. This Court held a hearing on the motion which lasted five weeks, beginning November 3, 1997 and concluding December 4, 1997. Evidence produced at the hearing

---

1. With regard to the term "unitary," the Supreme Court has noted that "[c]ourts have used the terms 'dual' to denote a school system which has engaged in intentional segregation of students by race, and 'unitary' to describe a school system which has been brought into compliance with the command of the Constitution." *Board of Ed. of Oklahoma City v. Dowell*, 498 U.S. 237, 246, 111 S.Ct. 630, 636, 112 L.Ed.2d 715 (1991). Moreover, the Court has also stated that "the term 'unitary' does not have a fixed meaning or content and does not confine the court's discretion in a way that departs from traditional equitable principles." *Freeman v. Pitts*, 503 U.S. 467, 468, 112 S.Ct. 1430, 1432, 118 L.Ed.2d 108 (1992).

included testimony from several expert witnesses, the Superintendent of the District, various other administrators, teachers, employees and former employees of the District, an employee of the Ohio Department of Education, members of the Cleveland Board of Education, Plaintiff Class members, and parents/guardians of Cleveland City School District students. The Court has reviewed all of the testimony, the exhibits from the hearing, and the post-hearing briefs filed by the parties.[2] For the reasons set forth below, this Court will grant the State Defendants and District's Motion for Unitary Status.

## BACKGROUND

This case was originally filed with the Court on December 12, 1973, over 24 years ago. On August 31, 1976, the Court held that "defendant boards of education through their constituent members and their appointed superintendents violated Plaintiffs' Fourteenth Amendment rights to equal protection under the laws by intentionally fostering and maintaining a segregated school system." *Reed v. Rhodes*, 422 F.Supp. 708 (N.D.Ohio 1976)(Battisti, J).[3] On February 6, 1978, the District Court reaffirmed its earlier conclusion that the State and District were liable for maintaining a *de jure* segregated school system. *Reed v. Rhodes*, 455 F.Supp. 546 (N.D.Ohio 1978)(Battisti, J), *aff'd* 607 F.2d 714 (6th Cir.1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980). The Court cited over 200 specific constitutional violations, categorized according to the general techniques employed to effect racial seg-

regation, including: boundary changes; conversion of board-owned facilities; optional attendance zones; assignment or reassignment of students; construction of new school facilities; additions to existing schools; busing; school closings; portable classroom facilities; changing grade structures; manipulation of school capacity; special transfers; and faculty assignment. The Court noted that "these numerous constitutional violations had systemwide impact entitling plaintiffs to a systemwide remedy." *Id.* at 550.

The Court's Remedial Order, also issued on February 6, 1978, adopted a plan to remedy this systemwide unconstitutional segregation. The Remedial Order addressed, *inter alia*, student assignments, educational programs, transportation, safety and security, management and financial considerations, and the role of the State. *Reed v. Rhodes*, 455 F.Supp. 569 (N.D.Ohio 1978)(Battisti, J). These original obligations were eventually expanded into fifteen remedial components. The fifteen remedial components are (1) Student Assignments; (2) Testing and Tracking; (3) Reading Skills Program; (4) Counseling, Career Guidance and Student Training; (5) Magnet and Vocational Schools and Programs; (6) Cooperation with Universities, Businesses and Cultural Institutions; (7) Extracurricular Activities; (8) Staff Development; (9) Student Rights; (10) School Community Relations; (11) Transportation; (12) Safety and Security; (13) Management Capability and Financial Integrity; (14) Staff Desegregation; and (15) Obligations of the State Defendants. Dr. Christine Rossell, a

---

**2.** Exhibits were admitted into evidence on February 6, 1998.

**3.** As a preliminary matter, Plaintiffs and the Board assert that the "District" never was named as a Defendant and that the District "has no legal obligation to address remedial or Consent Decree requirements." (*Plaintiffs' and Defendant Cleveland Board of Education's Supplemental Proposed Findings of Fact and Conclusions of Law*, 2/13/98, at 2). The State has identified the "District" as the Cleveland City School District and its Superintendent. (*State Defendants and District's Amended Findings of Fact and Conclusions of Law*, 2/13/98, at 2). This Court recognizes that the "District" per se was not identified as a party in the original liability opinion. However, the Court identified the Ohio State Board of Education, its members

and the Superintendent of Public Instruction, and the Board of Education of the Cleveland City School District, its members and its Superintendent. These same entities are identified in Section 1 of the May 25, 1994 Consent Decree.

The Court finds no merit·in Plaintiffs and the Board's assertion due to the fact that the Superintendent of the Cleveland City School District maintains an identity distinctly separate from the Board of Education of the Cleveland City School District since the issuance of the Court's March 3, 1995 Order. Moreover, all Parties were present when the Board's counsel, in chambers, stated that the Board desired separate representation. Plaintiffs and the Board's assertion has no effect on the merits of this decision as the State Defendants and the District jointly presented their evidence to the Court.

national expert who has studied desegregation for twenty-five years, testified that with regard to desegregation orders, the remedial obligations imposed upon the Cleveland City School District are more detailed and expansive than those of any other school district she has previously studied. This case imposes approximately two to three times the number of remedial obligations as compared to those imposed on any other school district subject to a desegregation order. (Vol.IV, 748, 788).[4]

From 1978 until the early 1990's, the Parties litigated the specific details and implementation of the Remedial Order and subsequent orders aimed at remedying these past intentional segregative practices. Finally, in March of 1994, the Parties entered into a Settlement Agreement with the intended purpose of bringing this case to an orderly and just resolution and supporting reformation of the educational processes in the Cleveland Public Schools. After conducting a Fairness Hearing, the Court issued an Order converting the Settlement Agreement into an enforceable Consent Decree. *Reed v. Rhodes,* 869 F.Supp. 1274 (N.D.Ohio 1994)(Battisti, J.).

As noted in the Consent Decree in 1994, the District confronted severe financial problems. The financial condition of the District continued to deteriorate in 1995 as the District remained unsuccessful in its attempts to pass a levy, the proceeds of which were to help fund the Consent Decree. Prompted by this desperate financial condition, accompanying managerial problems, and the impact of these conditions on the District's ability to achieve uninterrupted implementation of the remedial desegregation orders and the Consent Decree, the Court directed the State Superintendent "to assume immediate supervision and operational, fiscal and personnel

management of the District." (Order, 3/3/95, at 6)(Krupansky, J.).

On May 8, 1996, the Court granted the State's motion for a declaration of partial unitary status for the Student Assignment component of the Remedial Order and vacated portions of the Consent Decree requiring the use of racial parameters in assigning students.[5]

The motion at issue before this Court was filed pursuant to Section 15 of the Consent Decree which provides:

> The Parties shall request, after appropriate evidentiary proceedings, that the Court enter its Order releasing the Defendants from all further obligations, except those which are defined herein for the period from July 1, 1997 to July 1, 2000 if it finds that:
>
> a. The Defendants have implemented all provisions of this Agreement and complied with all extant remedial orders to the extent practicable; and,
>
> b. All vestiges of past discrimination and segregation have been eliminated to the extent practicable; and,
>
> c. The Defendants have otherwise demonstrated good faith commitment to their constitutional obligations.

(Order, 5/25/94, § 15).

### APPLICABLE STANDARD

As specified in this Court's Order of October 3, 1997, the Motion for Unitary Status will be examined pursuant to Section 15 of the May 25, 1994 Consent Decree as proposed by the Parties and adopted by the Court. The Court has previously stated that Defendants bear the burden of demonstrating compliance with the Consent Decree and all extant remedial orders to the extent practicable.[6] The Parties were informed of the

---

4. Testimony from the hearing is referenced by the transcript volume and the page from which the finding is derived.

5. The Court's Order regarding Student Assignments is currently on appeal to the Sixth Circuit Court of Appeals. *Reed v. Rhodes,* 934 F.Supp. 1533 (N.D.Ohio, 1996)(Krupansky, J.), appeal docketed, No. 96–3603 (6th Cir. May 31, 1996).

6. Defendants were not required to address either the Transportation component or the Student Assignments component at the hearing as the Parties stipulated that Defendants had complied with the Transportation component and the Court found on May 8, 1996 that Defendants had achieved unitary status as to Student Assignments. (*Order,* 10/3/97, at 3). However, some findings regarding the Magnet Schools compo-

necessity to specifically reference obligations contained in the extant remedial orders and the Consent Decree. (*Order,* 10/3/97, at 3). Defendants relied upon the *Compliance, Management, and Reporting Plan* (the "Plan") for this purpose. Collaboratively, the Parties and the Office on School Monitoring and Community Relations ("OSMCR") developed this management plan in 1995 which contains the outstanding remedial obligations and the steps Defendants would take to comply with the orders.[7]

The Court instructed the Parties that it was "interested in determining Defendants *present* level of compliance with the extant remedial orders and the Consent Decree." (*Order,* 10/3/97, at 3). The Court noted that "the date of the Consent Decree should serve as the ultimate baseline," since OSMCR assessed Defendants' remedial compliance at that time and the Parties incorporated that assessment into Section 9 of the Consent Decree. The Court instructed Defendants, however, to use their own judgment in determining an appropriate date from which to enable the Court to adequately assess Defendants' present level of compliance. *Id.* at 4. Defendants chose the 1995–1996 school year as the date from which to establish compliance.

■ In addition to complying with the Consent Decree and the extant remedial obligations, Section 15 of the Consent Decree also requires that all vestiges of past discrimination and segregation be eliminated to the extent practicable. As noted in *Freeman v. Pitts,* 503 U.S. 467, 496, 112 S.Ct. 1430, 1448, 118 L.Ed.2d 108 (1992), "[t]he vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied."

■ With regard to the burden of proof as to vestiges, it has been established that: [a] controlling distinction in the burden of proof analysis is first, whether a defendant has been adjudged to be a constitutional

violator, and second, whether an educational vestige was originally identified when liability was found.

*Jenkins v. Missouri,* 959 F.Supp. 1151, 1157 (W.D.Mo.1997), aff'd, 122 F.3d 588 (8th Cir. 1997). Moreover, the Eighth Circuit has stated:

> [g]enerally, once there has been a finding that a defendant established an unlawful dual school system in the past, there is a presumption that current disparities are the result of the defendant's unconstitutional conduct...Only when a school district has attained unitary status does the burden of proving disparities were caused by intentional segregation shift back to the plaintiffs.

*Jenkins v. Missouri,* 122 F.3d 588, 593 (8th Cir.1997).

■ Finally, beyond demonstrating compliance and the elimination of vestiges, Section 15 requires Defendants to have otherwise demonstrated a good faith commitment to their constitutional obligations. With regard to this good faith commitment, the school district's record of compliance with remedial obligations is of utmost importance. As previously noted by the Supreme Court, "[a] school system is better positioned to demonstrate its good-faith commitment to a constitutional course of action when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations." *Freeman,* 503 U.S. at 491, 112 S.Ct. at 1446 (1992). Furthermore, the Court also noted that "[a] district court need not accept at face value the profession of a school board which has intentionally discriminated that it will cease to do so in the future. But in deciding whether to modify or dissolve a desegregation decree, a school board's compliance with previous court orders is obviously relevant." *Board of Ed. of Oklahoma v. Dowell,* 498 U.S. 237, 249, 111 S.Ct. 630, 637, 112 L.Ed.2d 715 (1991). Thus, Defendants' record of complying with its remedial obligations and eliminating all vestiges of past discrimination to the extent practicable

nent do reference Defendants' compliance as to the Student Assignments component.

**7.** The *Compliance, Management, and Reporting Plan* was admitted into evidence as Defendants' Exhibit 2.

greatly impacts upon the Court's determination of whether Defendants have demonstrated a good faith commitment to their constitutional obligations.[8]

■ Relying upon the factors set forth in Section 15 of the Consent Decree, this Court's task is to assess whether the system that once operated as a dual system is now operating as a unitary system in all respects. The Court is mindful of the fact that the ultimate goal of a desegregation case such as this is to restore the victims of the discriminatory conduct to the position they would have occupied in the absence of that conduct and to restore State and local authorities to the control of a school system that is operating in compliance with the Constitution. *Freeman,* 503 U.S. at 489, 112 S.Ct. at 1445 (*citing Milliken v. Bradley,* 433 U.S. 267, 280–281, 97 S.Ct. 2749, 2757–2758, 53 L.Ed.2d 745 (1977)). Applying the standards delineated above, the Court makes the following findings of fact and conclusions of law.

### COOPERATION WITH UNIVERSITIES, BUSINESSES AND CULTURAL INSTITUTIONS

*FINDINGS OF FACT:*

1. Cooperative educational ventures include, but are not limited to, partnerships between a school and a university, business or cultural institution. Other cooperative educational ventures include local entities which sponsor or participate in activities at schools, such as the Cleveland Initiative for Education, the ICARE program, and The Cleveland Commission on Higher Education. These partnerships often sponsor such events as career days, proficiency activities, and field trips. Such partnerships have also provided additional assistance to the District in implementing Court orders. (Vol.I, 116, 118–121).

2. The State Defendants and District work with The Cleveland Initiative for Edu-cation to coordinate cooperative educational ventures with District schools and the local business community. (Vol.I, 119–120).

3. ICARE, a cultural program funded by local foundations, provides an on-site coordinator at the District and coordinates school partnerships with cultural institutions. (Vol.I, 121).

4. The Cleveland Commission on Higher Education, a commission comprised of local colleges and universities, coordinates school partnerships with local colleges and universities. (Vol.I, 121).

5. Defendants encourage schools to establish and maintain cooperative educational ventures and Defendants monitor the activities in which universities, businesses and cultural institutions participate with local schools. (Vol.I, 128).

6. Dr. Christine Rossell is an expert in the area of educational policy research methods, policy analysis, school desegregation plans and magnet schools. Dr. Rossell has conducted school desegregation research for 25 years and has studied over 600 school districts subject to desegregation orders. Dr. Rossell noted that although other districts have implemented such programs, Cleveland is the only District she has ever encountered that is actually subject to specific remedial obligations in the area of cooperation with universities, businesses and cultural institutions. (Vol.IV, 725, 742).

7. Dr. Rossell observed District schools and reviewed data regarding the Defendants' cooperative educational ventures. (Vol.IV, 724–25)

8. Defendants' cooperative educational ventures and partnership activities are delineated in Defendants' Exhibits 25 through 30.

9. Since the 1995–1996 school year, all schools have participated in cooperative educational ventures with universities, businesses or cultural institutions. (Vol.I, 129).

---

**8.** The Court notes that Section 15 of the Consent Decree closely parallels the standard identified by the Supreme Court in determining whether to order complete or partial relief from a desegregation decree. The Court has stated that "the ultimate inquiry is whether the constitutional violator has complied in good faith with the decree since it was entered and whether the vestiges of discrimination have been eliminated to the extent practicable." *Missouri v. Jenkins,* 515 U.S. 70, 89, 115 S.Ct. 2038, 2049, 132 L.Ed.2d 63 (1995)(*citing Freeman v. Pitts,* 503 U.S. at 492, 112 S.Ct. at 1446)(*citation omitted).*

10. Sixty percent of District schools have partnerships with cultural institutions. (Vol. IV, 731).

11. Ninety-five percent of all schools within the District have partnerships with universities, businesses or cultural institutions. (Defs.' Ex. 348, Figure 1).

12. Ninety six percent of the students enrolled in schools within the District (65,311 students) benefit from partnership activities. (Vol.IV, 733).

13. No racial pattern exists with regard to schools with partnerships or without partnerships. (Vol.IV, 731–32)(Def's Ex. 348, Figure 2).

14. Dr. Rossell concluded that the community supports these activities. (Vol.IV, 734).

15. Defendants have provided documentation to OSMCR and Plaintiffs regarding the Defendants' efforts to develop, implement, monitor and maintain cooperative educational ventures. (Vol.I, 130)(Defs.' Ex. 22–23).

16. Dr. Rossell ultimately concluded that she "has not seen a more impressive [University, Business and Cultural] partnership program, more involvement in collaborative relationships with universities, business, and cultural institutions, or more documentation of that involvement. Such a program shows the Defendants' good faith compliance with the Remedial Orders and the 1994 Consent Decree." (Defs.' Ex. 348, at 7).

17. Prior to August 1995, Bert Holt was employed by the District. However, Ms. Holt has not been employed by the District since 1995 and testified that she has no personal knowledge of or responsibility for the Defendants' cooperative educational ventures or their present efforts to comply with the outstanding remedial orders. (Vol.XIV, 2867–69).

18. Plaintiffs' expert, Dr. Robert Green was offered as an expert in all areas of remedial compliance. Dr. Green has served as an expert in this case since 1974 and submitted an expert report for this hearing which was admitted into evidence as Plaintiffs' Exhibit H. This expert report, however-

er, contains no data or any specific references to research or scholarly materials to substantiate his assertions. Dr. Green also failed to submit any form of a rebuttal report. (Vol.XVII, 3300–07).

*CONCLUSIONS OF LAW:*

1. The remedial obligations which remain in the area of Cooperation with Universities, Businesses and Cultural Institutions consist of the following:

a) Develop and implement a plan of cooperative education drawing on the resources of area universities, businesses, and cultural institutions... (Order, 10/16/78);

b) The School District shall be responsible to initiate and maintain working relationships with universities, businesses and cultural institutions, as well as with other private sector and non-profit entities, consistent with the Remedial Order. (Order, 4/24/81);

c) The District's plans, actions, cooperative agreements and results shall be documented. (Order 4/24/81).

2. The Court concluded on May 8, 1996 that the Defendants implemented "an effective program of cooperation with universities, and businesses and cultural institutions." *Reed v. Rhodes,* 934 F.Supp. 1533, 1552 (N.D.Ohio 1996) (Krupansky, J.).

3. Plaintiffs stipulated that it "would be easiest to reach agreement on or stipulate to compliance as defined in Section 15 of the Consent Decree with respect to [several components including,] Cooperation with Universities and Businesses." (*Joint Report on Negotiations Relative to the Status of Remedial Compliance,* 7/24/97).

4. Plaintiffs also stipulated that "Defendants have performed some of their remedial and Consent Decree obligations by establishing cooperative relationships with universities and businesses as they contend." (*Plaintiffs' Analysis of Defendants' Remedial Compliance,* 7/28/97).

5. Defendants have developed, implemented and continue to maintain cooperative educational ventures with local universities,

businesses and cultural institutions, as well as with private sector and non-profit entities.

6. Defendants have documented these actions and have provided such information to Plaintiffs and OSMCR on a regular basis.

7. The Defendants have continued to comply in good faith with the extant remedial obligations and provisions of the Consent Decree related to Cooperation with Universities, Businesses and Cultural Institutions.

8. Plaintiffs have not asserted that Defendants have failed to comply with any of the aforementioned remedial obligations related to Cooperation with Universities, Businesses and Cultural Institutions. Rather, Plaintiffs only express concerns as related to the following aspects: (1) the number of students involved is unknown; (2) the perceptions of the parties involved are unclear; (3) not all schools have partnerships; and (4) the partnerships have not increased academic performance or eliminated segregation.

9. Plaintiffs have failed to cite any remedial order that would govern such allegations. (*State Defendants and Cleveland City School District's Motion to Narrow the Issues to be Decided at the Unitary Status Hearing*, Attach. A).

10. Plaintiffs' allegations of non-compliance are without merit as no remedial order places any obligation on Defendants as to these matters.

11. Plaintiffs and Defendant Cleveland Board of Education conclude that "[t]he record has established and Plaintiffs acknowledge that Defendants have made some progress with respect to their remedial obligations concerning ... Cooperation with Universities, Businesses and Cultural Institutions." Furthermore, Plaintiffs and Defendant Cleveland Board of Education recommended that this Court vacate Defendants' remedial obligations related to Cooperation with Universities, Businesses and Cultural Institutions. (*Plaintiffs and Defendant Cleveland Board of Education's Substitute Proposed Findings of Fact and Conclusions of Law*, 1/20/98, at 63).

12. Dr. Green's expert report is of suspect weight to this Court's analysis due to the report's lack of data and support.

## MAGNET SCHOOLS AND PROGRAMS

### FINDINGS OF FACT:

19. Defendants' magnet school program currently serves over 15,000 students and includes 36 different programs. Program offerings include arts and science, law and public policy and thematic programs. (Vol.I, 146–47).

20. Defendants distribute magnet school program materials to all parents which include descriptions of the particular magnet school programs, locations and any admission criteria. This information is also included in a document entitled *Guide to Schools and Programs of Choice*, which is also provided to parents and Plaintiffs. (Vol.I, 163)(Defs' Ex. 41, 52).

21. Defendants sponsor an annual Magnet School of Choice Night and other events to promote their magnet school programs and to inform the community of the magnet school offerings. (Vol.I, 154–55)(Defs' Ex. 51).

22. Plaintiffs have participated in the development of the magnet programs, in decisions to discontinue certain magnet school programs, and in decisions regarding the addition, expansion, or relocation of magnet programs. (Vol.I, 148–49).

23. Defendants' magnet school programs have received state and federal grants and national awards. Over the last nine years, Defendants have received over $12 million in federal grants for magnet school programs. (Vol.I, 178–79)(Defs' Ex. 68).

24. Magnet school programs are located throughout the District to ensure that all students have equal access. After examining the locations of the magnet school programs, Dr. Rossell concluded that students on the East side and West side of the City have equal access to the magnet schools. (Vol. I, 154; Vol. III, 672–73)(Defs' Ex. 344, Fig. 8).

25. Focused Recruitment is a form of recruitment used by the District to attempt to secure students of a certain race necessary to maintain a certain racial percentage in a school to roughly reflect the overall racial

composition of the district. (Vol.I, 151–52)(Defs' Ex. 62–63).

26. Defendants have attempted to recruit students who reside outside of the Cleveland City School District to magnet school programs by advertising the magnet program offerings throughout Cuyahoga County. (Vol.I, 154).

27. Magnet schools are given the same resources and evaluated in the same manner as are non-magnet schools. Funding is allocated based upon enrollment. (Vol.I, 185–86).

28. Defendants have provided documentation of their magnet school programs to Plaintiffs and OSMCR both at compliance meetings and upon request. The documentation provided at compliance meetings is included as Defendants' Exhibits 41, 44, 45 and 46. (Vol.I, 158–59).

29. Plaintiffs have not challenged the accuracy of any data provided by Defendants with respect to magnet schools and programs. (Vol.I, 175).

30. Plaintiffs advised Defendants that they had complied with the remedial obligations regarding magnet schools and programs. (Vol.I, 175–76).

31. Magnet schools participate in cooperative educational ventures with local universities, businesses and cultural institutions. (Vol.I, 157).

32. The study of magnet schools is one of Dr. Christine Rossell's areas of expertise. Dr. Rossell has served as a court appointed expert in three desegregation cases and is not aware of any individual who has conducted more research on magnet schools than herself. (Vol.III, 628–30, 638).

33. In September of 1997, Dr. Rossell visited 21 magnet schools and interviewed the Superintendent, building principals, program administrators and teachers. (Vol.III, 641–42).

34. Dr. Rossell concluded that the Defendants have complied with the remedial obligations related to magnet and vocational schools. (Vol.III, 641).

35. Dr. Rossell concluded that the District has one of the best magnet school programs in the United States: the District's magnet schools are professionally staffed and designed; the District has more dedicated magnet schools, which are the superior form of magnet schools, than any other school district in the United States; and the District has a higher percentage of students enrolled in magnet schools and programs than any other district that has been declared unitary. Only two other school districts in the United States have higher quality magnets and have more resources committed to them, and those districts use magnets as special enrichment centers. (Vol. III, 660, 662; Vol. IV, 690, 720–21).

36. Dr. Rossell examined the racial composition of the District's magnet schools and programs and concluded that they have maintained a high level of racial balance even after the Court declared pupil assignments unitary in 1996. (Vol.III, 675–79).

37. Magnet schools and programs have attracted students to "opposite race neighborhoods." An opposite race neighborhood is a neighborhood that is above or below the percentage of minority students in the District. (Vol.IV, 715–16).

38. No orders in this case identify elements necessary to have a successful magnet program, and, therefore, it is helpful to view criteria used by other districts that have been declared unitary to examine what was achieved and what other courts have considered reasonable. (Vol.3, 668).

39. Dr. Rossell concludes that magnet schools are highly effective desegregation tools as evidenced by the continued desegregation in the Cleveland City Schools after the Court's declaration of unitary status as to pupil assignments; even in 1996, the Cleveland School District was more racially balanced than either Mobile or Dallas at the time they were declared unitary. (Vol.III, 650–51)(Defs.' Ex. 344, Fig. 2).

40. The unitary decision regarding pupil assignments was a reasonable decision because compared to other school districts declared unitary, the Cleveland City School District was one of the more racially integrated districts among minority school districts. (Vol.III, 657–58).

41. Even though no actual racial balance standard exists for magnet schools in Cleveland, the District has complied with the common standard used throughout the United States of +/− 20 percentage points of the percentage of black students enrolled in the District; for the 1996–97 school year, ninety-two percent of the District's magnet programs were racially balanced at +/−20 percentage points. (Vol.III, 680–82)(Defs' Ex. 344, App. 2).

42. In 1996, the District had a higher percentage of black students in magnet schools than the Savannah and Dallas school districts, which were declared unitary in 1993 and 1994, respectively. (Vol.III, 665)(Defs' Ex. 344, Fig. 6).

43. Plaintiffs' expert, Dr. Robert Green, offered no data to contradict Dr. Rossell's conclusion regarding racial diversity in magnet schools. (Vol.XVII, 3320).

44. Dr. Rossell also examined the academic achievement of students who attend magnet schools and concluded that students who attend magnet schools have higher achievement than those in non-magnet schools. (Vol.IV, 695).

45. Students enrolled in magnet schools or programs achieve higher on the mathematics and reading components of the California Achievement Test ("CAT Test") and pass the Ohio Proficiency Tests at a higher level than students enrolled in non-magnet schools or programs. (Vol.IV, 697–98).

46. Plaintiffs' expert, Dr. Green, offered no data to contradict Dr. Rossell's conclusion regarding higher academic achievement in magnet schools. (Vol.XVII, 3320).

47. Dr. Rossell also examined community and parent support for magnet schools. Over 3,000 students are on the waiting lists to enter the magnet schools and programs. A majority of parents of African–American and other students believe magnet schools are superior to non-magnet schools. Ninety-five percent of parents of African–American and other students would continue their child in magnet schools. Ninety percent of parents of African–American and other students believe magnet schools meet their expectations. (Vol I, 179–80; Vol. IV, 710–11).

48. Dr. Rossell concluded that Defendants have complied with the remedial obligations related to magnet schools and programs, and that the Defendants have exhibited a good faith commitment to their constitutional obligations related to magnet schools and programs. (Vol.IV, 721–22).

*CONCLUSIONS OF LAW:*

■ 13. The outstanding remedial obligations in the area of Magnet and Vocational Schools and Programs consist of the following:

a) Such [magnet] schools and programs shall be so located as to ensure that alternatives to regular assignments be roughly equal from cluster to cluster in terms of number of alternatives, their diversity and attractiveness; shall be open to students on an equal and fair basis; and shall have admission or placement criteria that are written, non-discriminatory, program-related (unless operated on an open admissions basis, in which case the criteria shall so state), and available to the public... Admission or placement results shall be documented. (Order, 4/24/81);

b) Such [magnet] schools and programs, on a space-available basis, shall be offered to neighboring school districts. Efforts to interest neighboring districts and their results shall be documented. (Order, 4/24/81);

c) Such [magnet] schools and programs shall be open on a reasonable basis to students with special needs. Plans for such schools and programs shall so demonstrate. (Order, 4/24/81);

d) Such [magnet] schools and programs shall be provided resources (fiscal, equipment, space, materials, and staff) that are comparable to (i.e., do not appreciably exceed) the resources of regular schools at the same grade level for programs and services in the core curriculum (i.e., subject-matter areas normally required or offered in all District schools of a particular grade level). Plans for magnet and vocational schools and programs shall so demonstrate. (Order, 4/24/81);

e) Such [magnet] schools and programs shall be planned, developed and operated with maximum feasible participation by parents, community representatives, and private-sector entities, since the voluntary-assignment and special-curriculum characteristics of such schools and programs make them especially suited to intensive, long-term, mutually beneficial relationships between schools and parents, schools and community, and schools and private-sector entities. No preference shall, however, be given to magnet and vocational schools and programs in the development and use of such resources. The initiation and fostering of such participation and involvement shall be the responsibility of the School District, and shall be documented. (Order, 4/24/81);

f) Such [magnet] schools and programs shall be subject to evaluation, review, modification and termination as are other schools and programs in the District. The results of such procedures shall be available to the Court. (Order, 4/24/81);

g) The District will consult Plaintiffs on the continued siting and projected funding of all existing, or enhanced, or new magnet schools, magnet programs, and community model schools. (Order, 5/25/94, § 11.5).

14. The Court found on May 8, 1996 that by introducing and implementing an effective magnet school program the Defendants have substantially complied to the extent practicable with this component. *Reed v. Rhodes*, 934 F.Supp. at 1552.

15. Magnet schools are located throughout the District and are offered on a fair and equal basis to all students. Magnet schools have written, nondiscriminatory admission and placement criteria, which is available to the public.

16. Defendants offer magnet school placements to neighboring school districts.

17. Defendants offer magnet schools and programs to students with special needs.

18. Magnet schools receive comparable resources to those of non-magnet schools and are subject to similar evaluation, review, modification and termination.

19. Magnet schools are developed and implemented with parent and community participation.

20. Defendants have consulted Plaintiffs on the continued siting, funding, and closings of magnet schools and programs.

21. The Defendants, in good faith, have continued to comply with the extant remedial obligations related to Magnet Schools to the extent practicable.

22. Plaintiffs stipulated that it "would be easiest to reach agreement on or stipulate to compliance as defined in Section 15 of the Consent Decree with respect to [several components including,] Magnet and Vocational Schools." (*Joint Report on Negotiations Relative to the Status of Remedial Compliance*, 7/24/97). Plaintiffs also stipulated that "Defendants have performed some of their remedial and Consent Decree obligations relative to Magnet and Vocational Schools/Programs as they contend." (*Plaintiffs' Analysis of Defendants' Remedial Compliance*, 7/28/97, at 2).

23. Plaintiffs have alleged noncompliance with regard to the following: (1) students enrolled in magnet school programs are not diverse; (2) students in magnet schools do not perform better than students enrolled in non-magnet programs; and (3) the program has failed to generate community confidence and failed to generate offerings based on need.

24. Plaintiffs' allegations of noncompliance are without merit as no such specific requirements exist. Nevertheless, the District's magnet schools and programs are diverse, more academically successful than non-magnet schools, and regarded favorably by the community.

25. Plaintiffs and Defendant Cleveland Board of Education concluded that "[t]he record has established and Plaintiffs acknowledge that Defendants have made some progress with respect to their remedial obligations concerning ... Magnet Schools and Programs." Furthermore, Plaintiffs and Defendant Cleveland Board of Education recommended that this Court vacate Defen-

dants' remedial obligations related to Magnet Schools and Programs. (*Plaintiffs and Defendant Cleveland Board of Education's Substitute Proposed Findings of Fact and Conclusions of Law,* 1/20/98, at 61, 63).

## *EXTRACURRICULAR ACTIVITIES*

### *FINDINGS OF FACT:*

49. Board Policy 6184 enumerates the Defendants' policy and plan for extracurricular activities. Board Policy 6184a requires that all school-sponsored extracurricular activities be conducted in a nondiscriminatory manner and equally accessible to every student. (Vol.I, 186–88)(Defs' Ex. 74).

50. Extracurricular activities are offered at all grade levels. (Vol.I, 187).

51. Since the 1995–1996 school year, Defendants have monitored and documented any one-race activities, that is extracurricular activities whose participants are all of the same race. A monthly report is produced which includes all one-race activities. If a one-race activity exists, Defendants take corrective action, such as focused recruitment, to encourage students of other races to participate in activities. Coaches and sponsors of extracurricular activities receive training regarding corrective action. Defendants acknowledge that a predominantly one-race school may constitute a valid reason for a one-race activity. (Vol.I, 188–91).

52. Plaintiffs approved Defendants' decision to reduce the number of extracurricular activities during the 1995–1996 school year to one sport per season per student, for financial reasons. (Vol.I, 204–05).

53. As a result of additional revenues the District received from a City parking tax, the number of extracurricular activities offered during the 1996–1997 school year was increased. (Vol.I, 205)(Defs.' Ex. 73).

54. As a result of the operating levy that passed in November 1996, the number of extracurricular activities offered during the 1997–1998 school year was further increased. (Vol.I, 205)(Defs.' Ex. 75).

55. Defendants provided documentation to Plaintiffs and OSMCR regarding compliance efforts with the extracurricular activity

remedial obligations at compliance meetings and upon request.(Vol.I, 188, 191–92)(Defs.' Ex. 71, 72, 74).

56. Plaintiffs have not challenged the accuracy of any data provided by Defendants with respect to extracurricular activities. (Vol.I, 202).

57. Plaintiffs have not advised Defendants of any matters which would indicate possible noncompliance in the area of extracurricular activities. (Vol.I, 202–204).

### *CONCLUSIONS OF LAW:*

26. The outstanding remedial obligations in the area of Extracurricular Activities consist of the following:

a) Defendants shall establish a nondiscriminatory plan and written policy for extracurricular activities. (Order 10/16/78);

b) Defendants shall establish clear guidelines delineating methods of focused recruitment, define and report "one race" activities, and provide guidance to principals in their enforcement or monitoring of the plan. (Order, 2/11/81);

c) Defendants shall report corrective actions and focused recruitment directed at one-race activities. (Order, 2/11/81);

d) Defendants shall develop an "internal assessment mechanism" to identify problems and implement and correct action with respect to the District's extracurricular activities. (Order, 4/24/81);

e) Defendants shall adopt monitoring devices and training to make every attempt to assure that student participation in extracurricular activities "more or less reflects the racial composition of the school insofar as practical." (Order, 2/11/81).

27. The Court found on May 8, 1996 that the Defendants had implemented "an effective program encouraging and implementing non-discriminatory extracurricular activities." *Reed v. Rhodes,* 934 F.Supp. at 1552.

28. Plaintiffs and the Board have not asserted a failure to comply with any of the aforementioned obligations. Rather,

Plaintiffs and the Board only allege that Defendants have sacrificed extracurricular activities purportedly because of financial constraints.

29. Plaintiffs have not cited any remedial order in support of such an obligation as no remedial obligation relating to extracurricular activities prohibits the Defendants from limiting extracurricular activities when sufficient funding does not exist. Defendants' Exhibit 71 refers to such reductions and Plaintiffs failed to raise any such concerns to the Court prior to the hearing.

30. Defendants have continued to comply with the remedial obligations related to the Extracurricular Activities component.

31. Defendants have implemented a non-discriminatory, written policy for extracurricular activities.

32. Defendants monitor and report one-race activities and have implemented corrective action, when necessary, to assure that student participation reflects the racial composition of the school, to the extent practical.

33. Plaintiffs stipulated that "it would be easiest to reach agreement on or stipulate to compliance as defined in Section 15 of the Consent Decree with respect to [several components including,] Extracurricular Activities." (*Joint Report on Negotiations Relative to the Status of Remedial Compliance,* 7/24/97).

34. Plaintiffs and Defendant Cleveland Board of Education concluded that "[t]he record has established and Plaintiffs acknowledge that Defendants have made some progress with respect to their remedial obligations concerning . . . Extracurricular Activities." Furthermore, Plaintiffs and Defendant Cleveland Board of Education recommended that this Court vacate Defendants' remedial obligations related to Extracurricular Activities. (*Plaintiffs and Defendant Cleveland Board of Education's Substitute Proposed Findings of Fact and Conclusions of Law,* 1/20/98, at 61, 63).

### STAFF DEVELOPMENT

*FINDINGS OF FACT:*

58. Dr. Richard Boyd, Deputy State Superintendent for the Cleveland Public Schools was not aware of any comprehensive staff development plan in April of 1995 when he began working as Deputy State Superintendent for the District but was aware of a number of staff development programs that were being administered. (Vol.XIII, 2574).

59. Since 1995, the Defendants have developed and implemented a Staff Development plan and offered staff development activities to District personnel. Defendants' staff development activities are ongoing and permanent. (Vol.VI, 1423)(Defs.'Ex.183).

60. In June 1997, the Defendants implemented a new staff development plan, entitled *A Plan for Comprehensive Employee Development in the Cleveland Public School District,* (the "Staff Development Plan") which has been developed in accordance with accepted processes and clearly addresses the Defendants' remedial obligations. The Plan was admitted as Defendants' Exhibit 183. (Vol.VI, 1419).

61. During the period from 1993 until 1997, Defendants offered 33,000 hours of staff development training to District personnel. Of the total hours offered, 609 hours were targeted toward Afri–Centric and Multi–Cultural infusion. (Vol.XV, 2958)(Defs.' Ex. 346, T.6).

62. During the 1995–1996 school year, Defendants spent approximately $3,900,000 on staff development activities. (Vol.XV, 2958).

63. During the 1996–1997 school year, Defendants spent approximately $5,000,000 on staff development. (Vol.XV, 2958).

64. The Staff Development Plan includes goals, performance objectives and the District's mission statement and incorporates the Remedial Orders and Vision 21. (Vol.VI, 1426–27, 1430, 1433).

65. The District conducts needs assessments for the Staff Development program and provides staff training based on documented needs. The District also offers training on cultural diversity, preventing discriminatory practices, and Defendants' desegregation-related obligations. (Vol.VI, 1435–1439, 1444).

66. Training is also provided to non-teaching staff to ensure that all individuals who work for the District contribute to the effective education of the students. (Vol.VI, 1439).

67. Staff development activities are offered on a non-discriminatory basis. (Vol.VI, 1440).

68. Defendants also provide additional staff development training for those personnel at "bottom quartile schools." (Vol.VI, 1440–41).

69. The Staff Development Plan encourages enhanced use of technology. (Vol.VI, 1438).

70. Dr. Livesteen Carter and James Penning are responsible for implementing the Staff Development Plan. ( Vol. VI, 1449).

71. Since 1995, the Defendants have identified Indicators of Effectiveness for their staff development activities and the Plan incorporates these Indicators. (Vol.VI, 1456).

72. Defendants document all staff development activities through the use of quarterly reports. (Vol.VI, 1422–1423).

73. Dr. Achilles is an expert in the area of staff development and prepared an expert report which was admitted as Defendants' Exhibit 341. (Vol.XV, 2915).

74. Based on scholarship and literature regarding staff development, Dr. Achilles identified characteristics of an effective staff development plan. Dr. Achilles compared the Staff Development Plan to these characteristics and concluded that the Plan includes these characteristics. (Vol.XV, 2956–57)(Defs.' Ex. 346, T.3–4).

75. Plaintiffs' experts, Drs. Green and Trent, did not conduct any similar analysis of the Staff Development Plan.

76. Dr. Achilles concluded that: the District has developed a professional development plan which satisfies the criteria of a good plan; the Plan addresses the remedial requirements of *Reed v. Rhodes*; and, the Plan should be effective. (Vol.XV, 2959, 3007).

77. Although previously employed by the District, Ms. Ruth Dent–Lyles has not been employed by the District since 1994 and is not familiar with Defendants' current staff development compliance efforts. (Vol.XVIII, 3550).

*CONCLUSIONS OF LAW:*

35. The remedial obligations which remain in the area of Staff Development consist of the following:

a) The required 'staff development' ... shall consist of identifiable elements, including but not limited to goals, performance objectives, instructional programming and/or services, assessment, staff training, parent involvement, and clear lines of responsibility and accountability. Such elements shall be verified in the plan for and in the operation of these programs. (Final Standard VIII.A; Order 4/24/81);

b) The School District shall provide appropriate training to staff ... consistent with identified needs. Such training shall be documented. (Final Standard VIII.B; Order, 4/24/81);

c) The District shall identify indicators of effective training for [staff] and use such indicators to measure the District's program. (Final Standard VIII.C; Order, 4/24/81);

d) The required program as a whole shall have documented results. (Final Standard VIII.D; Order, 4/24/81);

e) Staff development and student training in human relations shall be an ongoing and permanent program within the District. (Final Standard VIII.E; Order, 4/24/81).

36. On May 8, 1996, the Court concluded that the Defendants had complied to the extent practicable with their remedial obligations related to Staff Development by introducing and implementing student training and staff development programs. *Reed v. Rhodes*, 934 F.Supp. at 1552.

37. The Defendants have continued to comply with the remedial obligations related to Staff Development.

38. The Defendants have created and implemented a new, comprehensive staff devel-

opment plan and currently have a permanent program in place.

39. The Staff Development Plan meets the criteria established for effective staff development plans and includes goals, performance objectives, assessment mechanisms, staff training, parent involvement and accountability. The training provided is based on needs.

40. Plaintiffs acknowledged "that there has been some compliance in the area of staff development relative to certificated staff." (*Plaintiffs' Analysis of Defendants' Remedial Compliance,* 7/28/97).

41. Plaintiffs allege noncompliance with respect to Staff Development based upon the inability of the Parties to measure the effectiveness of the new Staff Development Plan which was implemented at the beginning of the 1997–1998 school year. (*Plaintiffs' Brief in Opposition,*[9] at 15).

42. Relying upon credible expert testimony, the Plan meets the standards for effective staff development plans.

### *STUDENT RIGHTS*

*FINDINGS OF FACT:*

78. Since the 1995–1996 school year, the Defendants have annually developed and implemented a code of student conduct, which is entitled *Student Handbook: Rights and Responsibilities* ("Student Handbook"). (Vol.V, 893–94, 897).

79. District policies require non-discriminatory implementation of the Student Handbook. (Vol.V, 909).

80. Defendants print and distribute the Student Handbook in English and Spanish as Spanish-speaking students comprise eight percent of the student body. Students and parents who do not speak English or Spanish receive special tutoring at bilingual education sites to ensure that they receive instruction on the Student Handbook. (Vol. V, 898–99; 905–06).

81. Defendants annually assemble a Student Handbook Adoption Committee, which consists of parents, students, teachers, Cleveland Teachers' Union representatives, District administrators, and community experts, to review the content of the Student Handbook to protect against arbitrary or discriminatory discipline practices. (Vol.V, 894–895).

82. The Student Handbook Adoption Committee provides recommendations which are forwarded to the State Superintendent of Public Instruction for his review, input and final approval. The recommendations are then forwarded to Plaintiffs and OSMCR for further review, input, and approval. After this review and approval process is completed, the Student Handbook is then filed with the Court. (Vol.V, 896).

83. Defendants annually distribute the Student Handbook to all students and provide training regarding the Student Handbook. (Vol.V, 898–99, 903–05).

84. Defendants distribute the Student Handbook to all District personnel, including teachers, classified personnel, building administrators and Central Office staff and provide training regarding the Student Handbook and implementation of its policies and procedures. (Vol.V, 898–902, 907–08, 924–26)(Def.'s Ex. 196).

85. Defendants distribute a summary-form of the Student Handbook to parents through the annual school calendar, which is mailed to each home at the beginning of the school year. All schools offer training to parents regarding the Student Handbook on an annual basis. (Vol.V, 902–03)(Defs.' Ex. 213).

86. Defendants maintain detailed records regarding disciplinary actions, including suspensions and expulsions, by race and school. (Vol.V, 910, 913–17).

87. Defendants monitor such records for purposes of Safety and Security, and for purposes of ensuring equitable application of the Handbook, particularly with regard to possible disproportionate representation of African–American students in suspensions and expulsions and any corresponding corrective actions taken. ( Vol. V, 911–914; 916–17).

---

9. The full title of the Brief is *Plaintiffs' Brief in Opposition to State and Cleveland District's Mo-* *tion for Declaration of Unitary Status ("Plaintiffs' Brief in Opposition ")*, filed August 18, 1997.

88. Defendants have established and follow clear lines of responsibility and accountability for achieving the remedial obligations related to the Student Rights component. (Vol.V, 917).

89. Defendants provided documentation to Plaintiffs and OSMCR upon request or at compliance meetings regarding remedial obligation efforts concerning the student rights component. The documentation provided to Plaintiffs and OSMCR is included as Defendants' Exhibits 196–200. (Vol. II, 293–94; Vol. V, 919, 924).

90. Dr. Charles Achilles is an expert in the area of student rights. (Vol.XV, 2915).

91. Dr. Achilles reviewed and analyzed the Student Handbook, suspension and expulsion rates, and data from the State Department of Education comparing Cleveland with other school districts to determine whether Defendants discipline students on a non-discriminatory basis. Dr. Achilles prepared an expert report of his analysis that was admitted as Defendants' Exhibit 341. (Vol.XV, 2917–19).

92. Dr. Achilles reviewed extensive literature regarding codes of student conduct and found that effective codes of student conduct share the following characteristics: (1) fair and equitable; (2) explicit and precise; (3) goal-oriented; (4) constructive; (5) readable; (6) reviewed periodically; (7) cooperatively planned; and (8) informative of due process. (Vol.XV, 2922)(Defs.' Ex. 341, at 11).

93. After analyzing the Student Handbook and comparing its contents with the recognized attributes of effective codes, Dr. Achilles concluded the following:

a. The Student Handbook is fair and equitable; it is non-discriminatory in content and makes no distinctions based upon race. (Vol.XV, 2923);

b. The Student Handbook is explicit and precise; it is well-organized and contains a comprehensive list of misbehaviors and accompanying corrective actions. (Vol.XV, 2923);

c. The Student Handbook is goal oriented; it includes an explanation of desegregation, Vision 21 and the District's policy of maintaining a school environment free of discrimination.[10] (Vol.XV, 2923–24);

d. The Student Handbook is constructive; it delineates a hierarchy of corrective actions to address misbehaviors of varying severity. (Vol.XV, 2924);

e. The Student Handbook is readable, although it is very difficult to understand. It is very similar, however, to codes of conduct used by other school districts where the codes are designed to be very specific. (Vol.XV, 2925);

f. Defendants take affirmative steps to help ensure that all students receive and understand the Student Handbook. (Vol.XV, 2924–25);

g. The Student Handbook is reviewed periodically through a process involving the District, Plaintiffs, and OSMCR. (Vol.XV, 2925);

h. The Student Handbook is cooperatively planned through the use of committees which include students, teachers, community representatives, and other educators in the planning process. (Vol.XV, 2926);

i. The Student Handbook delineates a due process procedure throughout. (Vol.XV, 2926).

94. The Student Handbook delineates four categories or classes of misbehaviors: Class I, II, III and IV. (Vol. XV, 2934)(Defs.' Ex. 226, 227).

95. Class I offenses are the least serious offenses. Class IV offenses are the most serious offenses. (Defs.' Ex. 226, 227, 341).

96. Only the building principal may suspend a student. The principal's discretion to suspend or not to suspend decreases as the severity of the misbehavior increases. (Vol.XV, 2938) (Defs.' Ex. 226, 341).

10. Vision 21 is the educational plan designed to substantially increase the opportunity for all students, particularly African–American students, to receive a high quality education in a desegregated environment.

97. Dr. Achilles analyzed suspensions and expulsions issued by the District to determine if disciplinary actions are issued in a non-discriminatory manner. Dr. Achilles specifically evaluated Plaintiffs' allegation that African–American students are discriminated against in the application of student discipline in the District because as a numerical matter, the percentage of African–American students who are suspended is higher than the percentage of African–American students enrolled in the District. (Defs.' Ex. 341, at 1).

98. Dr. Achilles analyzed suspensions and expulsions by a number of variables including race of student and administrator, gender, class of misbehavior, and grade point average. Dr. Achilles also compared District suspension/expulsion rates and indices to other city, state and national data. Plaintiffs' experts, Drs. Green and Trent, did not perform any analysis similar to that performed by Dr. Achilles. Dr. Green provided no data to support his conclusions. (Vol.XV, 2951)(Defs.' Ex. 341, 346).

99. Based upon his analysis, Dr. Achilles concluded the following:

a. Seven percent of the students enrolled in the District received 73% of suspensions issued by the District. (Vol.XV, 2933);

b. No variable (race, gender) produces a 1.0 ratio. There is a greater disproportionality by gender than by race. (Vol. XV, 2932–34);

c. With respect to Class I offenses (least serious misbehavior, greatest principal discretion), the number of suspensions received by African–American students was proportionate to the number of African–American students enrolled in the District. During the last six years, African–American students accounted for 70% of the total student population and on average received 69.5% of the suspensions for Class I misbehaviors. (Vol.XV, 2935–37);

d. Every year, since 1993, "disproportionality" increases as the severity of the offenses increase and administrator discretion decreases. State law requires administrators to expel or suspend a student for certain serious offenses. (Vol.XV, 2937–39);

e. The District consistently has one of the lowest suspension rates among the large Ohio urban school districts. (Vol.XV, 2947);

f. The national suspension index is higher than the District's index. The average rate at which school districts across the nation suspend African–American students is 2.0, or twice their representation in the population. The District's index is 1.04. (Vol.XV, 2948);

g. As a result of the remedial obligations related to Staff Desegregation, most schools within the District have biracial administrative teams. Assistant principals are usually responsible for student discipline within a particular building while it is generally the responsibility of the principals to make suspension determinations. (Vol.XV, 2949).

100. Dr. Achilles concluded that any difference in suspension or expulsion rates when compared to the number of African–American students enrolled in the District is not a result of racial discrimination or a vestige of the prior discriminatory school system. (Vol.XV, 2952).

101. Dr. Achilles ultimately concluded that Defendants have met their remedial obligations related to Student Rights through the development and use of an explicit non-discriminatory code of student conduct that is administered fairly and exceeds the standards for such codes. (Vol.XV, 2927)(Defs.' Ex. 341, at 2).

*CONCLUSIONS OF LAW:*

43. The outstanding remedial obligations remaining in the area of Student Rights consist of the following:

a) [T]he Cleveland Board must adopt and disseminate a Code of Student Rights, Responsibilities, and Discipline, together with a list of policies and procedures

for standardized systemwide implementation in a manner which will protect the rights of students against arbitrary or discriminatory exclusions, suspensions, or expulsions. (Order, 2/6/78);

b) The required Code of Student Rights, Responsibilities and Discipline (Remedial Order, pp. 81–83) shall be disseminated and explained to students on a periodic basis. The Code shall be prepared in as many languages as the District deems necessary for clear understanding by students whose native language is other than English. (Order, 4/24/81);

c) In addition, the Board shall incorporate into the Code of Student Rights, Responsibilities and Discipline criteria and procedures for assigning students to programs that serve as alternatives to suspensions or 'adjusted transfers.' (Order, 8/25/82);

d) The required 'policies and procedures for standardized system wide implementation' of the required Code (Remedial Order, p. 82) shall be in writing and shall be verifiable at the school level where student discipline takes place. (Order 4/24/81);

e) City Defendants shall maintain detailed records regarding daily enrollment, disciplinary actions, suspensions, expulsions and dropouts, by race and by school, and shall, beginning in September, 1978, submit these statistics to the Court on a quarterly basis. (Order, 2/6/78);

f) The required record-keeping (Remedial Order, pp. 82–83) shall be designed, in part, to identify problems and to initiate corrective action with regard to actual or possible discrimination in the area of Student Rights. The nature and extent of use of statistics and records on discipline actions and dropouts as indicators of needs for corrective action shall be documented. (Order, 4/24/81);

g) The District's actions in protecting 'the rights of students against arbitrary or discriminatory exclusions, suspensions, or expulsions' (Remedial Order, p. 82) or discrimination in other forms of discipline used by the District (e.g., corporal punishment) shall have documented results. (Order, 4/24/81);

h) The School District shall provide appropriate training of its staff at all levels in the proper administration of the required policies and procedures. (Order, 4/24/81);

i) The School District shall establish and follow clear lines of responsibility and accountability, from the headquarters level to the classroom level, for achieving the requirements of the Remedial Order regarding Student Rights. Such responsibilities and accountability shall be disseminated in writing to all staff at all levels. (Order, 4/24/81).

44. On May 8, 1996, the Court concluded that "the Plaintiffs' factually unsupported conclusions to the contrary, escalating inner city minority student absenteeism, the dropout rate, suspension rate, expulsion rate, and low academic achievement are not attributable to the performance of the local school administration..." *Reed v. Rhodes,* 934 F.Supp. at 1555.

45. The Defendants have continued to comply with the remedial obligations related to Student Rights.

46. Plaintiffs stipulated that "it would be easiest to reach agreement on or stipulate to compliance as defined in Section 15 of the Consent Decree with respect to [several components including, ] Student Rights." (*Joint Report on Negotiations Relative to the Status of Remedial Compliance,* 7/24/97).

47. Plaintiffs acknowledged that "Defendants have performed some of their remedial and Consent Decree obligations relative to Student Rights as they contend." (*Plaintiffs' Analysis of Defendants' Remedial Compliance,* 7/28/97).

48. Plaintiffs' allegation of non-compliance relates to the fact that African–American students are suspended "at nearly a 10% higher rate than their representation in the school population." Plaintiffs further allege that such a disparity constitutes a "vestige" of unlawful discrimination. (*Plaintiffs' Brief*

*in Opposition,* at 9–10; *Board's Brief,* at 7–8).

49. As related to Plaintiffs' allegation of non-compliance, the remedial obligations demand that the Student Handbook be nondiscriminatory and protect against arbitrary or discriminatory exclusions, suspensions or expulsions. A numerical disparity, standing alone, does not indicate discrimination.

50. Based upon the expert testimony rendered, the disparity does not constitute a vestige. Plaintiffs' assertion to the contrary is not supported by the record.

## COUNSELING, CAREER GUIDANCE & STUDENT TRAINING IN HUMAN RELATIONS

### FINDINGS OF FACT:

102. Defendants have established both a counseling and career guidance program and a student training program in human relations. (Vol.VII, 1680, 1689).

103. The Defendants have created and implemented a nondiscriminatory counseling and career guidance program to serve all students equally in the Cleveland Public Schools. The goal of the program is to prepare students to graduate and enter the world of work or post-secondary education. (Vol.VII, 1680–81).

104. The nondiscriminatory implementation of the counseling and career guidance programs is evidenced in the District's assessment instruments, the career passport program, college entrance testing, graduate surveys, placement mechanisms, group guidance activities and individual counseling. (Vol.VII, 1682–83).

105. The District conducts surveys to assess the percentage of students who attend a college or university after graduating from the Cleveland Public Schools. Forty-seven percent of the graduating class of 1996 are currently full-time students, of which seventy-eight percent are African–American, while ten percent of the graduating class are part-time students. (Vol.VII, 1684–85).

106. The counseling and career guidance program consists of group guidance activities, individual guidance activities, career enhancement activities, and assistance in student planning and scheduling. (Vol.VII, 1680).

107. The counseling and career guidance program is competency based and meets or exceeds all State minimum standards for such programs. (Vol.VII, 1680).

108. The District's counseling and career guidance program is ongoing and permanent. (Vol.VII, 1681).

109. The District's counseling and career guidance program includes performance objectives. (Vol.VII, 1681).

110. The District's counseling and career guidance program incorporates parental involvement in a variety of ways, including a program that requires all parents of eighth grade students to meet with guidance counselors to plan the student's future program of study. (Vol.VII, 1681–82).

111. All counselors receive mandatory training which is based on needs assessments conducted by the District. Such training is monitored and documented through the use of attendance records. (Vol.VII, 1686, 1688).

112. Defendants, in coordination with Plaintiffs and OSMCR, developed Indicators of Effectiveness for their counseling and career guidance programs, which were approved by the Court. (Vol.VII, 1689).

113. The Defendants have implemented a student training program designed to aid students in addressing and understanding cross-cultural differences. Identified elements of the program include an emphasis on reducing prejudice and developing social and problem-solving skills. (Vol.VII, 1689).

114. As part of the student training program, each school within the District has a student leadership team designed to aid in addressing human relations issues within each school. The student leadership teams are used on a continuous basis for mediation purposes and crisis intervention. (Vol.VII, 1689–90).

115. The student training program is ongoing and permanent, includes performance objectives, and is based on identified needs. (Vol.VII, 1690–91).

116. The District, in coordination with Plaintiffs and OSMCR, developed Indicators of Effectiveness for the student training program. (Vol.VII, 1693).

117. Experts from Cleveland State University developed the needs assessment mechanism for the counseling, career guidance, and student training program. (Vol. VII, 1690–91).

118. The assessment mechanism surveys student attitudes about their schools, student discipline, the guidance and counseling program, and the career development program, and is designed to target the areas identified in the Indicators of Effectiveness. (Vol.VII, 1691).

119. The assessment results are used to formulate appropriate counseling and career guidance services. (Vol.VII, 1697).

120. Similar student assessment programs were conducted in 1995–96 and 1996–97. (Vol.VII, 1692).

121. The Defendants have established clear lines of responsibility for implementing nondiscriminatory counseling, career guidance, and student training programs. (Vol. VII, 1692).

122. Defendants provided documentation regarding their compliance with the counseling, career guidance, and student training components at compliance meetings. (Vol. VII, 1694–1704)(Defs.' Ex. 241, 242, 244).

123. The performance standards for counseling, career guidance, and student training were substantially attained in the 1995–96 and 1996–97 school years. (Vol.VII, 1700–1707)(Defs.' Ex. 244, 245, 246).

*CONCLUSIONS OF LAW:*

51. The outstanding remedial orders in the area of Counseling, Career Guidance, and Student Training in Human Relations consist of the following:

a) In order to reduce the pressures on students undergoing desegregation and to prevent resegregation resulting from curriculum or program choices of students, the defendants shall institute an effective, nondiscriminatory counseling and career guidance program. The program shall ensure that students are counseled on a racially nondiscriminatory basis as to opportunities in employment or higher education and as to vocational and other special educational programs. (Order, 2/6/78);

b) The School District shall provide appropriate training to counselors and career guidance staff, consistent with identified needs. Such training shall be documented. (Final Standard IV.B, Order, 4/24/81);

c) The District shall identify indicators of an effective, nondiscriminatory counseling and career guidance program, and use such indicators to measure the District's program. The District's self-selected indicators, program assessments, and corrective steps shall be documented. The District's self-selected indicators shall be subject to Court review and approval... The required program as a whole shall have documented results. (Final Standard IV.C. and IV.D.; Order 4/24/81);

d) The required ... student training ... shall consist of identifiable elements, including but not limited to goals, performance objectives, instructional programming and/or services, assessment staff training, parent involvement, and clear lines of responsibility and accountability. Such elements shall be verified in the plan for and in the operation of these programs. (Final Standard VIII. A., Order 4/24/81);

e) The School District shall provide appropriate training to ... students, consistent with identified needs. Such training shall be documented. (Final Standard VIII.B., Order 4/24/81);

f) The District shall identify indicators of effective training for ... students and use such indicators to measure the District's program. The District's self-selected indicators, program assessments, and corrective steps shall be documented. The District's self-selected indicators shall be subject to Court review and approval ...The required program as a whole shall have documented re-

sults. (Final Standard VIII.C. and VIII.D.; Order 4/24/81).

52. On May 8, 1996, the Court concluded that the Defendants had introduced and implemented "an effective and approved counseling and career guidance program." *Reed v. Rhodes*, 934 F.Supp. at 1552.

53. Defendants have continued to comply with their remedial obligations related to the Counseling and Career Guidance component. Defendants have maintained effective, non-discriminatory counseling and student training programs, which utilize Indicators of Effectiveness and provided training based upon identified needs. Defendants have submitted documentation to Plaintiffs, OSMCR and the Court identifying their counseling and student training programs.

54. Plaintiffs allege that Defendants have failed to comply with their remedial obligations related to the Counseling and Career Guidance component because of the high rate of suspensions, expulsions, and drop-outs among African–American students and because a parity gap exists between the reading achievement of African–American and other students. (*Plaintiffs' Brief in Opposition*, at 16–17). Plaintiffs' allegations of noncompliance regarding this component are not supported by the record and are not based upon remedial obligations related to this particular component.

### STAFF DESEGREGATION

#### FINDINGS OF FACT:

124. During the 1995–1996 school year, 99.15% of schools (116 of 117) had a faculty racial composition which was +/− 15 percentage points from the District average for elementary, middle and high schools. (Vol.I, 77–78)(Defs.' Ex. 3, at 5).

125. During the 1996–1997 school year, 90.6% of schools (106 of 117) had a faculty racial composition which was +/− 15 percentage points from the District average for elementary, middle and high schools. (Vol.I, 79)(Defs.' Ex. 12, at 8).

126. During the 1997–1998 school year, 95.8% of schools (113 of 118) had a faculty racial composition which was +/− 15 per-centage points from the District average for elementary, middle and high schools. (Vol.I, 79)(Defs.' Ex. 13).

127. During the 1995–1996 school year, 78.3% of schools (36 of 46) which had only one administrator and one clerical person were staffed by one minority person and one non-minority person. (Vol. I, 80 )(Defs.' Ex. 11).

128. During the 1996–1997 school year, 74.4% of schools (32 of 43) which had only one administrator and one clerical person were staffed by one minority person and one non-minority person. (Vol.I, 80–81)(Defs. Ex. 12, at 41).

129. During the 1997–1998 school year, 76.1% of schools (35 of 46) which had only one administrator and one clerical person were staffed by one minority person and one non-minority person. (Vol.I, 81)(Defs.' Ex. 13).

130. During the 1995–1996 school year, 86.6% of schools (46 of 55) which had more than one administrator had a racial balance of administrators which was no less than 33% and no more than 67% minority. (Vol.I, 82)(Defs.' Ex. 11).

131. During the 1996–1997 school year, 89.3% of schools (50 of 56) which had more than one administrator had a racial balance of administrators which was no less than 33% and no more than 67% minority. (Vol.I, 82)(Defs.' Ex. 12).

132. During the 1997–1998 school year, over 75% of schools (45 of 58) which had more than one administrator had a racial balance of administrators which was no less than 33% and no more than 67% minority. (Vol.I, 82)(Defs.' Ex. 13).

133. Since the 1995–1996 school year, 78.4% of schools with more than one clerk had a racial balance between 33% and 67% minority. (Vol.I, 81)(Defs.' Ex. 11, 12, 13).

134. Since the 1995–1996 school year the racial composition of food service staff has been within 33% to 67% minority. (Vol.I, 83–84)(Defs.' Ex. 11, 12, 13).

135. No unreasonable disparity exists with respect to experience and training levels of teaching staff at each building. "Unrea-

sonable disparity" means that schools are within three years of the District's mean level of experience and within one year of the District's mean level of training for full-time teachers at a particular level. (Vol.1, 85).

136. Since the 1995–1996 school year, 100% of schools had staff compositions within one year of the mean level of training for the District. Since the 1995–1996 school year, 80% of schools had staff compositions within three years of the mean level of experience for the District. (Vol.I, 86–87)(Defs.' Ex. 11, 12, 13).

137. Since 1995–1996, Defendants have submitted written reports to Plaintiffs and OSMCR identifying reasons why a particular school did not meet a numerical parameter related to Staff Desegregation. Possible reasons for not meeting certain parameters include the closing of some schools pursuant to court orders, labor pool deficiencies, and staff attrition. (Vol.I, 87–88)(Defs.' Ex. 11, 12, 13).

138. Since the 1995–1996 school year, Defendants have taken action, including monitoring vacancies, focused recruitment, and transferring staff to prevent staff resegregation. (Vol.I, 87–89).

139. Since the 1995–1996 school year, the Defendants have provided documentation to Plaintiffs and OSMCR regarding staff composition at compliance presentations and upon request. Such information is included in Defendants' Exhibits 11, 12 and 13. (Vol.I, 90–110).

140. Since the 1995–1996 school year, Defendants have maintained bilingual and other special education programs at the District. Approximately 3,200 students participate in bilingual education programs. Approximately 11,000 students receive special education services or participate in special education programs. (Vol.I, 84–85).

141. The District's Superintendent has attempted to maintain a racially diverse "Central Office Staff." (Vol.XIII, 2543–47)(Defs.' Ex. 338, 339).

142. Dr. Christine Rossell reviewed data regarding District staff composition and the remedial orders, visited 21 schools, and spoke with District employees. Dr. Rossell has conducted research on approximately 6 other school districts that have recently been declared unitary. (Vol.IV, 743–44).

143. Dr. Rossell concluded that 68% of the central administrative office staff is African–American and that 45% of the Superintendent's Management Team is African American. The national labor pool is approximately 12% African American. (Vol.IV, 750)(Defs.' Ex. 339).

144. Dr. Rossell concluded that for the 1996–97 school year, 91% of the District's schools had a faculty racial composition which was within +/− 15 percentage points of the District average for elementary, middle, and high schools. The range for staff desegregation of schools in school districts recently declared unitary is between 40 to 100 percent. The District's teacher racial balance is comparable to other districts that have been declared unitary. (Vol.IV, 745–46)(Defs.' Ex. 348, Fig. 13).

145. Dr. Rossell also concluded that the Defendants had achieved a high level of equity with regard to teacher training and experience. (Vol.IV, 746–47)(Defs.' Ex. 348).

146. Dr. Rossell believes that the Defendants have complied with their remedial obligations related to Staff Desegregation. (Vol. IV, 751).

*CONCLUSIONS OF LAW:*

■ 55. The outstanding remedial obligations in the area of Staff Desegregation consist of the following:

a) Prior to the opening of school each fall, no school may have a faculty racial composition during the life of [the Consent Decree] which varies by more than +/−15 percentage points from the district wide averages for elementary, middle and high schools. (Order, 5/25/94, § 5.1);

b) In those schools which have only one administrator and one clerical person, assignments shall be made so that the administrator and the clerical personal shall be one minority person and one non-minority person...

Where there are two administrative staff members in a school, the ratio of minori-

ty administrators to the total administrative staff of such school shall be as close to 50% as possible, but shall be no less than 33% and shall be no greater than 67%...

[T]he clerical staff shall be desegregated so that where there is only one clerk at a school, the clerk shall be a different race than the school principal...

Where there are two clerical staff members at a school, the ratio of minority clerical staff to the total clerical staff in each school shall be no less than 33% nor greater than 67%...

The Food Service staff charged with the management, supervision, and operation of the food services program shall be desegregated. (Order, 6/3/77);

c) The Court ... does hereby order the Cleveland Board of Education to report, on an annual basis ... the facts concerning the racial distribution and assignments of all custodians and assistant custodians... If, upon receipt of that report, Plaintiff's counsel determines the interest of Plaintiffs require a modification of the racial distribution of the custodial staff, the matter shall upon notice be brought to the attention of the Court. (Order, 11/4/81);

d) Reassignments of instructional and other staff shall be made in such a manner as to maintain the effective bilingual and other special education programs. (Order, 6/3/77);

e) In making assignments of instructional staff, the defendants shall insure that there exists no unreasonable disparity in respect to experience levels and training among instructional staff of the school. (Order, 6/3/77);

f) Although percentages specified here are not intended as rigid quotas, the defendants have the burden of demonstrating in every case that practical necessity justifies deviation greater than that provided for herein. (Order, 6/3/77);

g) Too many factors are connected in this complex situation [staff desegregation] to allow even the slightest divergence to remain uncorrected. The Court has made it clear on various occasions that the parties are obligated to strictly abide by the words and spirit of the Court's orders. If for some legally permissible reason they are unable to comply, then they are obligated to immediately demonstrate to the Court that their failure of performance is justified...

The deviation range provided for in the order was intended not to be the goal of the defendants' staff desegregation efforts. Rather, the deviation percentages represented fall-back ranges within which sanctions for noncompliance would not be imposed. (Order, 8/30/78);

h) To desegregate its instructional, administrative, custodial, clerical, and food services staffs.... The School District shall collect data and take such actions from time to time as may be necessary to prevent resegregation of the staff. Such actions shall be documented. (Final Standard XIV; Order 4/24/81).

56. Section 5.1 of the Consent Decree supersedes the Court's August 30, 1978 Order, which also delineated faculty racial composition requirements.

57. On May 8, 1996, the Court concluded that the administrative and certified supervisory and teaching personnel as well as non-certified personnel of the District had been desegregated to the extent practicable. *Reed v. Rhodes,* 934 F.Supp. at 1551. The Court further noted that "for at least two years [Vision 21 was implemented] by a totally integrated administrative and certified supervisory and teaching staff." *Id.* at 1551–1552.

58. The Defendants have continued to comply with the remedial obligations related to Staff Desegregation.

59. Defendants have desegregated the instructional staff and have complied with the faculty racial composition requirements imposed pursuant to § 5.1 of the Consent Decree.

60. Defendants have continued to insure that no unreasonable disparity exists with regard to experience and training among instructional staff and have maintained effec-

tive bilingual and special education programs.

61. Defendants have also desegregated the administrative, clerical and food service staffs.

62. Defendants have monitored staff composition, collected data, and have taken appropriate actions to prevent resegregation. Defendants have provided such documentation to Plaintiffs and OSMCR.

63. Plaintiffs and the Board do not allege any non-compliance as to the aforementioned requirements related to the Staff Desegregation component. They do allege, however, that the Central Office Staff, particularly the Superintendent's Leadership Team, is racially isolated. (*Plaintiffs' Brief in Opposition,* at 15–16; *Board's Brief,* at 11). The remedial obligations regarding Staff Desegregation relate to the race and experience of personnel at the school building level; they do not impose any staff desegregation requirements relative to the racial composition of Central Office Staff. Plaintiffs also acknowledge that no such specific remedial obligation exists.

64. Plaintiffs and the Board's allegations that the composition of the Central Office Staff displays Defendants' lack of good faith is without merit. The record has established that Defendants have demonstrated a good faith effort to maintain a racially diverse Central Office Staff.

### *SCHOOL COMMUNITY RELATIONS*

### *FINDINGS OF FACT:*

147. The Defendants' written policy regarding community relations is included in District Policy Series 1000. (Defs.' Ex. 77).

148. The Student Handbook, distributed annually to all students, includes the District's code of discipline and information regarding Defendants' remedial obligations and compliance efforts related to the desegregation process. (Vol.II, 229, 243).

149. The Defendants provide parents with a variety of written materials to promote school-community relations including, the Student Handbook, the annual calendar, and information regarding School Communi-

ty Council ("SCC") training and various parent training programs. (Vol.II, 229–30).

150. As a specific example of Defendants' efforts to keep the public apprized of desegregation obligations, Defendants sponsored a number of activities following the Court's May 1996 Student Assignments decision, including a televised community forum, to inform the community of the Order and to explain its implications. (Vol.II, 244–45).

151. Ameritech provided additional telephone lines and training to the District to respond to parents' calls resulting from the unitary decision of May 1996 and also provides additional telephone service at the start of the school year to facilitate a smoother opening to the school year. (Vol.II, 245).

152. Defendants established a telephone complaint center to enable parents to report any complaints or concerns to the District. The District attempts to respond to all calls within four business days. ( Vol. II, 233–34; Vol. XIV, 2890).

153. The cover of the 1997–98 School Calendar depicted an African–American male student in a manner which has been perceived to negatively stereotype African–American students. The error was the result of an internal review oversight after the cover was designed by an external graphic design agency that used clip-art images of students. (Vol.II, 235–38).

154. The District took appropriate corrective actions once the disfavorable depiction of the African–American student was identified, including sending a letter of apology to all parents and students and replacing any calendar covers that had not yet been distributed. (Vol.II, 237)(Pls.' Ex. PP).

155. The cover of the 1997–1998 school calendar was ultimately reviewed by the District's Director of External Affairs and Communications, who is an African–American male. (Vol.II, 238–39).

156. Systems are in place to assure that no occurrences similar to that of the Fall 1997 school calendar incident reoccur and that all school publications are appropriately screened concerning issues of racial and cultural diversity. (Vol.XIII, 2556).

157. The District encourages parent participation through SCCs, Schools of Choice Nights, parent-teacher organizations, and other organized parent activities. (Vol.II, 231–32).

158. All district schools have a SCC. SCCs are responsive to the individual needs of the school and participate in reviewing building budgets, making administrative staffing determinations, and evaluating curricular and extra-curricular concerns. All schools must allocate resources to their SCC. (Vol.II, 240).

159. The District also has a District Community Council ("DCC") and Cluster Community Councils ("CCCs"). A DCC deals with activities at the District level and CCCs focus on concerns of various grade levels. (Vol.II, 240–41).

160. SCCs, DCCs and CCCs operate pursuant to District Policy, which was approved by the Court in November 1986. (Defs.' Ex. 77, Attach. E).

161. Lucille Short, Plaintiffs' witness, is the School Community Council ("SCC") chairperson at a District middle school. Ms. Short testified that her SCC was functioning and that the District provides extensive SCC training every year to SCC chairpersons. (Vol.XVIII, 3511, 3526).

162. Judith Simpson, Plaintiffs' witness, testified that School Community Councils are viable and active in all schools. (Vol.XVIII, 3542–44).

163. Dr. Rossell examined the Defendants' community relations efforts and concluded the following:

a. Some of the most effective measures used throughout the Nation to improve school-community relations are utilized by the Cleveland School District. (Vol. IV, 753).

b. Parents of African–American students prefer neighborhood schools even if it means that some schools will be predominately one race. (Vol.IV, 756).

c. Once the District adopted a plan using neighborhood schools plus magnets rather than mandatory reassignments, after the Court's May 1996 Order, the District's enrollment has stabilized with regard to race. (Vol.IV, 763).

d. The passage of the school levy in 1996 indicates that the community has confidence in the District's abilities. (Vol. IV, 764).

e. Ultimately, in comparing the District's accomplishments in the area of school community relations to other districts recently declared unitary, the Cleveland Public School District has achieved comparable success.

164. The Defendants coordinated extensive efforts to strengthen relations with the parents, the community, and the entire City of Cleveland while implementing a massive levy campaign in 1996. (Vol.II, 248–49).

165. As part of the District's attempts to improve community relations and community involvement, Superintendent Dr. Richard Boyd, on behalf of the District, signed a Memorandum of Understanding with Mayor Michael White. (Vol.XIII, 2550–51)(Defs.' Ex. 81).

166. Outstanding efforts among District personnel, especially those of Superintendent Dr. Richard Boyd, and the establishment of a levy accountability committee, helped to build confidence in the District and ultimately resulted in the passage of the November 1996 operating levy. This was the first operating levy to pass in the last 13 years. (Vol. II, 248–49).

167. Defendants provided documentation to Plaintiffs and OSMCR upon request or at compliance meetings regarding remedial obligation compliance efforts related to school-community relations. The documentation provided to Plaintiffs and OSMCR at compliance meetings is included as Defendants' Exhibits 76 through 82. (Vol.II, 250–66).

*CONCLUSIONS OF LAW:*

65. The outstanding remedial obligations in the area of School Community Relations consist of the following:

a) The School District's school-community relations activities shall consist of identifiable elements, including but not limited to goals, performance objectives, programming and/or services, assess-

ment, staff training, parent training, and clear lines of responsibility and accountability. Such elements shall be verifiable in the plans for and in the operation of these activities. (Final Standard X.A.; Order, 4/24/81);

b) For reasons of efficiency and cost effectiveness, the School District's school-community relations activities shall make maximum feasible use of available resources in the private sector, including the resources of non-profit entities. The District's efforts and results in obtaining such resources shall be documented. (Final Standard X.C.; Order, 4/24/81);

c) The School District shall continually inform the public as to the constitutional imperative of school desegregation, the Remedial Orders, and their specific plans for implementing said Orders. (Order 7/13/79) Formal information efforts shall be documented. (Final Standard X.D.; Order, 4/24/81);

d) The School District shall have a mechanism or procedure for efficiently receiving and disposing of parent complaints. The mechanism or procedure may be formal or informal in nature, provided it is efficient, effective and timely. The mechanism or procedure shall be identifiable, and its results shall be documented. (Final Standard X.E.; Order, 4/24/81);

e) School Community Councils (SCCs) will serve a critical role in the desegregation remedy. They will consist of parents of school children and other concerned citizens who have completed a twelve-hour training program covering a wide scope of issues, including school desegregation, school organization, testing practices, and school management. SCCs will function as advisory groups to the school principals and thereby safeguard the lawful operation of the schools. (Order, 11/20/86);

f) The Proposed Policy for the Operation and Training of School Community Councils in the Cleveland School District, filed with the Second Joint Report, IS HEREBY ADOPTED and shall be implemented immediately. The policy adopted herein supersedes any policies concerning SCCs currently in place in the Cleveland school district. The district shall distribute the policy to parents periodically and shall make it available in both English and Spanish. Each school in the district will have an SCC. (Order 11/20/86);

g) The School District's community relations activities related to desegregation shall be coordinated, for maximum effective results, with the District's various other community relations and/or parent-relations activities, including but not limited to various advisory committees. Such coordination shall be verifiable in the plans for and operation of these activities. (Order, 4/24/81);

h) The School District is required to "have documented results for its school-community relations program as a whole." (Order, 4/24/81).

66. On May 8, 1996, the Court concluded that Defendants had implemented "an effective program for enhancing community relations." *Reed v. Rhodes,* 934 F.Supp. at 1552.

67. Defendants have continued to comply with the remedial obligations related to the School–Community Relations component.

68. The school community relations activities include both parent and staff training. The desegregation-related school community relations activities are coordinated with various departments and activities throughout the District.

69. Defendants have made maximum use of available private sector resources.

70. Defendants have informed the public on a continuous basis regarding school desegregation obligations and related compliance efforts through the use of written materials, community forums, and various forms of public media.

71. Defendants have established a telephone center to efficiently receive and address parent complaints.

72. School Community Councils ("SCCs") operate pursuant to court-approved policy.

73. Defendants have documented their school community relations activities and have consistently provided such documentation to Plaintiffs and OSMCR.

74. Plaintiffs stipulated that "Defendants have performed some of their remedial and Consent Decree Obligations as it relates to School Community Relations." (*Plaintiffs' Analysis of Defendants' Remedial Compliance*, 7/28/97).

75. Plaintiffs and the Board have alleged three concerns with respect to School–Community Relations component: (1) a lack of communication with parent and community groups; (2) "the efficacy of the proposed conversion from School Community Councils (SCCs) to School Governance Counsels (SGCs)" and (3) Defendants have failed to address negative or misleading perceptions regarding desegregation. (*Plaintiffs' Brief in Opposition*, at 10–11; *Board's Brief in Opposition*, at 8).

76. The allegation regarding the lack of communication is without merit as it is not supported by the record produced at the hearing. Defendants have made a good faith effort to effectively communicate with parent and community groups. Likewise, the assertion that the School Community Relations department has failed to address misconceived perceptions regarding desegregation is also without merit. Defendants have made noticeable improvements over the past years at improving public perceptions of the District and its desegregation-related efforts.

77. Plaintiffs' concern regarding the conversion from SCCs to SGCs is not based upon any remedial obligation and does not evidence a lack of compliance on the part of Defendants.

78. The success of the November 1996 operating levy, the first operating levy passed by the electorate in 13 years, clearly indicates that the Cleveland community has a restored confidence in the system. Such restored confidence exists as strong evidence of Defendants' achievements relative to the School Community Relations component. The funds derived from the passage of the levy will total approximately $67 million annually and will be used to support 13 enhancement programs and gradually reduce the District's debt obligations.

## SAFETY AND SECURITY

### FINDINGS OF FACT:

168. Defendants' safety and security programs support their desegregation responsibilities. (Vol.V, 1030, 1058–62)(Defs.' Ex. 251, 256, 260, 261, 263, 264).

169. The Division of Safety and Security is responsible for all safety and security programs and services. (Vol.V, 1026–27)(Defs.' Ex. 254).

170. The Division of Safety and Security currently employs approximately 180 persons, of which 146 are security officers. Investigative counselors, dispatchers, the Mobile Response Team, and other clerical, supervisory and managerial personnel comprise the remainder of the Division. (Vol.V, 1026)(Defs.' Ex. 254).

171. Security officers are assigned to all secondary schools based on enrollment figures, incident reports, building configuration, and community evaluations. (Vol.V, 1037–38).

172. In responding to serious incidents, Defendants deploy investigative counselors to gather information regarding the incident and to contact the appropriate law enforcement agencies or support services as necessary. (Vol.V, 1024, 1038).

173. Two supervisors are responsible for monitoring the security officers and the investigative counselors. (Vol.V, 1025–26).

174. The Field Service Manager coordinates all daytime functions of the Safety and Security Division. (Vol.V, 1039).

175. The primary responsibility of the Mobile Response Units is to provide security to all District properties after school hours by patrolling school sites and properties and responding to alarms and other security concerns. (Vol.V, 1032–33).

176. The Gang Unit reviews incident reports and deals with gang-related incidents. (Vol.V, 1040).

177. Defendants' Safety and Security Procedural Manual identifies the policies,

procedures, and functions of the Safety and Security Program. (Vol.V, 1030–36)(Defs.' Ex. 251).

178. The Defendants annually review and revise the Procedural Manual to update policies and procedures to insure that it is responsive to the needs of the District. (Vol. V, 1031; 1036).

179. Defendants follow clear lines of responsibility and accountability in striving to satisfy the remedial requirements related to the Safety and Security component. (Vol.V, 1041–47, 1054–57)(Defs.' Ex. 254).

180. School principals receive in-service training concerning matters of safety and security, particularly with regard to reporting serious incidents. To encourage the reporting of such incidents, the number of incident reports filed by a principal is not used in any way as a reflective evaluation tool in evaluating the principal's overall performance. (Vol.V, 1053, 1057).

181. Defendants have evaluated the local surrounding areas of elementary schools for dangerous or hazardous areas in an attempt to formulate safe walking routes for the students. (Vol.V, 1062–63).

182. Since June 1996, Defendants have reviewed the *Survey and Evaluation of Safety and Security in the Cleveland City School District* prepared by Thomas J. Bader (*"Bader Report"*), and have exhibited a sincere good faith effort to implement many *Bader Report* recommendations.[11] Defendants' implementation efforts are documented in Defendants' Exhibit 266. (Vol.V, 1064–94).

183. Since June 1996, training of security officers has significantly increased. (Vol. III, 441; Vol. V, 1061–62).

184. Defendants have employed all of the most frequently used safety measures. Currently, 28 of 29 measures employed by school districts nationwide to address increasing violence in schools and society are used by the District. (Vol.XV, 2921).

185. Defendants provided documentation to Plaintiffs and OSMCR regarding compliance efforts in the area of safety and security at compliance meetings and upon request. (Vol.II, 322–23)(Defs.' Ex. 251–254).

186. Plaintiffs' expert, Dr. Green, provided no data or analysis to support allegations of noncompliance with the safety and security component. (Vol.XVII, 3327–29).

*CONCLUSIONS OF LAW:*

■■■ 79. The outstanding remedial obligations in the area of Safety and Security consist of the following:

a) [T]he City defendants in consultation with the State defendants, shall present the Court with a detailed safety and security program covering all of the components as set out at recommendations of the Special Master at 157–63, October 27, 1977. (Order, 2/6/78);

b) The School District shall establish and follow clear lines of responsibility and accountability for achieving the requirements of the Remedial Order. Such responsibilities and accountability shall be disseminated in writing to all affected staff at all levels. (Order, 4/24/81);

c) The School District's safety and security program shall consist of an appropriate combination of policies, regulations, training programs for school staff, information programs, and safety staff. The program shall be of a size and type commensurate with identified needs. The needs shall be documented and be kept current. (Order, 4/24/81);

d) The District's plans, actions and results in providing safety and security shall be documented. (Order, 4/24/81).

80. On May 8, 1996, the Court concluded that Defendants had implemented "an effective safety and security program." *Reed v. Rhodes,* 934 F.Supp. at 1552.

81. The Defendants have continued to implement an effective safety and security program, which includes policies, regulations, training and information programs, and safe-

---

11. The *Bader Report* was prepared pursuant to the Court's Order of June 1, 1995 directing that a survey and evaluation be conducted regarding safety and security measures utilized in the Cleveland City School District.

ty staff. Defendants also follow clear lines of responsibility in satisfying the remedial requirements related to the Safety and Security component.

82. Plaintiffs stipulated that "it would be easiest to reach agreement on or stipulate to compliance as defined in Section 15 of the Consent Decree with respect to [several components including,]Safety and Security." (*Joint Report on Negotiations Relative to the Status of Remedial Compliance*, 7/24/97).

83. Plaintiffs stipulated that "Defendants have performed some of their remedial and Consent Decree obligations relative to Safety and Security as they contend." (*Plaintiffs' Analysis of Defendants' Remedial Compliance*, 7/28/97).

84. Plaintiffs and the Board allege that Defendants have failed to comply with the Safety and Security component due to: (1) inadequate screening and training of employees; (2) the lack of specificity of the Procedural Manual as related to specific incidents; (3) the reluctance of principals to report serious incidents; (4) the insufficient size of the Gang Unit; and (5) an insufficient number of intervention programs. (*Plaintiffs' Brief in Opposition*, at 5; *Board's Brief in Opposition*, at 6).

85. The outstanding remedial orders do not impose any specific requirements on Defendants concerning the allegations of noncompliance asserted by Plaintiffs and the Board. However, testimony produced at the hearing indicates that any screening, training, and reporting deficiencies are being sufficiently addressed. The Procedural Manual is adequate and is not required to specify guidance as to the handling of any specific incident. As to the size and sufficiency of the Gang Unit and intervention programs, the Cleveland Public School District has demonstrated sincere good faith compliance efforts. Unfortunately, the social challenges facing the District are similar to those plaguing other urban school districts and are encountered across the nation. Plaintiffs and the Board's allegations are without merit.

### TESTING AND TRACKING

#### FINDINGS OF FACT:

187. The testing program of the Cleveland Public Schools is monitored by the District's Department of Assessment and Information Systems. (Vol.VI, 1197).

188. The District uses both standardized norm-referenced tests and criterion-referenced tests. Standardized norm-referenced tests are designed to measure the performance of District students against national norms in various subject areas. Criterion-referenced tests are designed to measure performance related to the curriculums specific to the District. (Vol.VI, 1202, 1206).

189. The Defendants have systems in place to ensure that all standardized and criterion referenced tests are developed in a nondiscriminatory manner. (Vol.VI, 1207).

190. The District has adopted policies and regulations to institutionalize nondiscriminatory practices in testing and tracking. (Vol. VI, 1202, 1217–18).

191. The District reviews standardized and criterion referenced tests on an eight to ten year cycle. When adopting new tests, the District follows a documented procedure to make certain that the test publishers followed appropriate bias review procedures insuring that the test instrument is free of gender and racial bias. (Vol.VI, 1203–05, 1208).

192. Once a new standardized norm-referenced test is adopted, the District performs equating studies in order to measure whether the new test measurements can be equated with the old test measurements. (Vol.VI, 1205).

193. The Defendants use a test selection committee consisting of District administrators, teachers, parents and community members to insure that standardized and criterion referenced tests are developed and selected in a nondiscriminatory manner. (Vol.VI, 1207–08).

194. Dr. Rossell noted that because the results of standardized tests are conformed to a bell curve measuring all students against national norms, such tests may operate adversely against students of lower socioeconomic status, regardless of their race. Such tests, however, are routinely used throughout

the nation as educational measures. (Vol.IV, 734).

195. Dr. Rossell also concluded that nationally normed standardized tests measure all Cleveland Public School students of similar socioeconomic status equally and do not discriminate against students on the basis of race. (Vol.VII, 1595).

196. The Defendants have systems in place, including policies and regulations, to insure that all teacher-made tests are developed in a nondiscriminatory manner. The District also annually reviews teacher-made tests to insure the nondiscriminatory development, administration, scoring and use of teacher-made tests. (Vol.VI, 1209–10)(Defs.' Ex. 122).

197. The Defendants have systems in place to insure that all tests are administered in a nondiscriminatory fashion. Standardized and criterion-referenced tests are administered in standardized settings throughout the District as prescribed by the test publisher and/or District policy. Teacher-made tests are administered in accordance with District policies and regulations. (Vol. VI, 1216–17).

198. The Department of Assessment and Accountability annually publishes and distributes a test schedule to each school building. Defendants provide instruction forms prior to the test administration. (Defs.' Ex. 123).

199. Defendants monitor test administrations throughout the District and prepare monitoring reports on the nondiscriminatory administration of tests. (Vol.VI, 1218–19).

200. The District has established policies and regulations to insure that all tests, both standardized and criterion-referenced, are scored in a nondiscriminatory manner. (Vol. VI, 1220–21)(Defs.' Ex. 143).

201. The Defendants have established policies and procedures to monitor test security and take corrective actions, where necessary. (Vol.VI, 1223–24).

202. The District has established policies and procedures to insure that test results are used in a nondiscriminatory fashion. (Vol. VI, 1225).

203. District policy governs Limited English Proficiency ("LAU–Bilingual") student placement. (Vol.VI, 1226).

204. District policy delineates the criteria for student eligibility for the Gifted and Talented or Major Work programs. Special Education program placement is governed by both District policy and State law. (Vol.VI, 1227–28, 1231).

205. District policy relating to the nondiscriminatory use of testing procedures, administration, and scoring aids in the determination of whether a student qualifies for Title 1 services. (Vol.VI, 1229–30).

206. Defendants do not use ability grouping or tracking to intentionally place students in segregated classrooms. (Vol.VI, 1232).

207. The District does not assign students by ability grouping where such assignments result in racially segregated assignments. (Vol.VI, 1232–33).

208. The Defendants have specific systems in place to protect against tracking and use the Single Race Class Report to monitor and implement corrective actions, where necessary. (Vol.VI, 1235–39)(Defs.' Ex. 124).

209. With regard to possible or actual discrimination or resegregation produced by testing or student placements, Defendants have developed and implemented an internal assessment mechanism to identify problems and initiate corrective action. (Vol.VI, 1245–46).

210. The Defendants annually rank all schools and identify the "bottom quartile schools" for special focus and selected services. (Vol.VI, 1247–58)(Defs.' Ex. 122, 145, 146).

211. Defendants provided documentation to Plaintiffs and OSMCR upon request or at compliance meetings regarding their compliance with testing and tracking remedial obligations. Plaintiffs did not challenge the accuracy of the information provided. The documentation provided to Plaintiffs and OSMCR at compliance meetings is included as Defendants' Exhibits 121, 122, 123 and 124. (Vol.II, 270, 273–76).

212. Plaintiffs have not presented any concerns regarding noncompliance in the

area of testing and tracking to this Court prior to this hearing. (Vol.VI, 1316).

213. Dr. Rossell evaluated Defendants' testing programs to determine whether any racial discrimination exists and ultimately concluded that no such racial discrimination against African–American students exists in the area of testing. (Vol.IV, 770).

214. Dr. Rossell determined that very little difference exists between the grades assigned to African–American and other students in the District. Specifically, 22% percent of grades earned by white students are As and Bs, 19% of grades earned by African–American students are As and Bs, and 24% of grades earned by Asian and Hispanic students are As and Bs. (Vol.IV, 769–70). Moreover, she noted that a higher percentage of African–American students(3.7) than white students (2.7) are identified as gifted and talented. (Defs.'Ex.348).

*CONCLUSIONS OF LAW:*

86. The outstanding remedial orders in the area of testing and tracking consist of the following:

a) [D]efendants are cautioned that they must insure that all tests, whether standardized, criterion referenced, or teacher made, are developed, administered and scored in a nondiscriminatory manner. (Order, 2/6/78);

b) The Court is particularly concerned that the results of such tests are used in a nondiscriminatory manner. (Order, 2/6/78);

c) Defendants were instructed to "avoid ability grouping or tracking students in segregated classrooms," and "not [to] assign students in ability grouping where such assignments result in racially segregated classrooms," (Order, 2/6/78) and to "[c]ease the assignment of students in ability groupings where such assignments result in racially segregated classrooms in racially integrated schools . . ." (Order, 10/16/78);

d) The School District shall establish and follow clear lines of responsibility and accountability, from the Headquarters level to the classroom, for achieving the requirements of the Remedial Order [in

Testing and Tracking]. Such responsibilities and accountability shall be disseminated in writing to all affected staff at all levels. (Order, 4/24/81);

e) The School District shall provide appropriate training to staff at all levels, consistent with identified needs. Such training shall be documented. (Order, 4/24/81);

f) The School District shall have an internal assessment mechanism, procedure or system to identify problems and to initiate corrective action with regard to actual or possible discrimination or resegregation produced by testing or student placements. Such assessment mechanism, procedure or system shall be identifiable, and it shall have documented results. (Order, 4/24/81).

87. On May 8, 1996, the Court concluded that Defendants had implemented "an effective, approved, and accurate testing and tracking program." *Reed v. Rhodes,* 934 F.Supp. at 1552.

88. Defendants have continued to comply with the remedial obligations associated with the testing and tracking component. Defendants have designed and implemented policies and procedures to insure that all tests are developed, administered, and scored in a nondiscriminatory manner and that such test results are also used in a nondiscriminatory manner. Defendants also continue to implement an assessment mechanism to identify possible problems produced by testing or student placement and to initiate appropriate corrective action when necessary. Defendants provide appropriate training to staff based upon identified needs and have avoided ability grouping or tracking students as specified in the remedial obligations. Defendants have also established and follow clear lines of responsibility and accountability for achieving the requirements of the remedial orders.

89. Plaintiffs allege non-compliance with the Testing and Tracking component based upon the following assertions: (1) teachers are inadequately trained with regard to teacher-made tests; (2) the inability of the Cleveland Public School children to succeed on the standardized, state-mandated profi-

ciency examinations emphasizes the continued effect of discriminatory testing and the Defendant's failure to document the effectiveness of their testing program; and (3) the use of nationally-normed tests has resulted in ability grouping and segregatory assignments. (*Plaintiffs' Brief in Opposition*, at 12).

90. With regard to training for teacher-made tests, testimony and documentation produced at the hearing evidences Defendants' compliance with this obligation.

91. Relying upon the expert testimony produced at the Hearing, Plaintiffs' claims regarding success on proficiency exams and ability grouping or segregative assignments are also without merit. As to these issues identified by Plaintiffs, neither the remedial obligations, this Court, nor the Supreme Court require the Defendants to guarantee success on proficiency testing; success is strongly influenced by many factors beyond the control of the school districts. *See Missouri v. Jenkins*, 515 U.S. 70, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995).

### AFFIRMATIVE READING SKILLS PROGRAM

*FINDINGS OF FACT:*

215. The District has implemented an affirmative reading skills programs which incorporates nationally known research-based reading programs and includes the following elements: coordination, instruction, goals, instructional services, training of staff, parental involvement, functional development, proficiency testing and clear lines of responsibility. (Vol.XII, 2469–70)

216. The District also provides additional services for students performing below District standards. (Vol.XII, 2471).

217. Defendants evaluate and assess any disparities in reading test scores of African–American and other students in the District and rely upon parity studies to refine the Affirmative Reading Skills Program. (Vol. VI, 1333–40; Vol. XII, 2471)( Defs.' Ex. 154).

218. Defendants annually report standardized reading test results of student performance, by race and school building. (Vol. VI, 1352–54)(Defs.' Ex. 151, 154).

219. Defendants define "adversely affected" students as students who (1) attended a school in 1978 in which 90 percent or more of the enrollment was African–American or other; and (2) scored below the 34th percentile on a reading comprehension subtest on the Comprehensive Test of Basic Skills or the California Achievement Test. (Vol.VI, 1330–31).

220. Defendants identified adversely affected students annually, and provided reading program services. By definition, no "adversely affected" students are enrolled in the District today. (Vol.VI, 1332–33).

221. Defendants regularly provided documentation to Plaintiffs and OSMCR upon request or at compliance meetings regarding remedial order compliance related to the affirmative reading skills program. (Vol.II, 281–82, 286–87)(Defs.'Ex.151, 152, 153).

222. Research strongly indicates that socioeconomic status ("SES") and family background influence a student's achievement in school. (Defs.' Ex. 345, p. 8).

223. Dr. Neil Bania is an expert in social statistics in the analysis of national, state and local social and economic data. Dr. Bania collected and reviewed census and demographic data and also analyzed poverty, population and employment statistics for the Cleveland City School District, the State of Ohio, and the United States. Dr. Bania prepared an expert report which was admitted into evidence as Defendants' Exhibit 343. (Vol.III, 532–33, 536, 577)(*See* Appendix A).

224. Dr. Bania analyzed the following variables: (1) persons 25 and over lacking a high school diploma; (2) percent of families with children in poverty; (3) percent of households with income less than $25,000; (4) percent of households headed by a single parent; (5) percent of persons 16 and older who are unemployed; (6) percent of births to single mothers; (7) percent of low birth weight births; (8) percent of persons receiving AFDC benefits; (9) teen fertility rates per 1000; (10) infant mortality rates per 1000; and (11) arrest rates for adults. (Defs.' Ex. 343).

225. The data provided by Dr. Bania was the most current data available for the variables he analyzed. (Vol.III, 592).

226. Plaintiffs' expert, Dr. Trent, agreed that the variables analyzed by Dr. Bania impact achievement. (Vol.XVI, 3069–70).

227. Of the above variables analyzed by Dr. Bania, black individuals had a higher incidence or frequency of the variables than white individuals. (Defs.' Ex. 343).

228. With respect to every variable analyzed by Dr. Bania, individuals living in Cleveland, regardless of race, had a higher incidence or frequency of the variable than individuals residing in other parts of Ohio. (Defs.' Ex. 343).

229. With respect to every variable analyzed by Dr. Bania, individuals living in Cleveland, regardless of race, had a higher incidence or frequency of the variable than individuals residing in other areas of the United States, when such data was available for analysis. (Defs.' Ex. 343).

230. Plaintiffs offered no evidence to contradict the data and conclusions offered by Dr. Bania.

231. Dr. Herbert Walberg is an expert in educational psychology, focusing on educational policy, desegregation, and student achievement. Dr. Walberg studied the Cleveland Public School system to determine whether the District discriminates against African–American students with respect to achievement. Dr. Walberg prepared an expert report and a rebuttal report which were admitted into evidence as Defendants' Exhibits 345 and 349, respectively. (Vol.VIII, 1723).

232. During the first 18 years of life, a student spends approximately thirteen percent (13%) of his waking hours in school, while approximately eighty-seven percent (87%) of a student's waking hours are spent outside of school. (Vol.VIII, 1751)(Defs.' Ex. 345, G).

233. Dr. Walberg testified that schools can attempt to impact on the time children spend outside of school by initiating parent programs, or through extending the school day, the school week, or the school year. (Vol.VIII, 1748).

234. Dr. Walberg has studied the relationship between socioeconomic status ("SES") and family background as they influence achievement. The national measure of SES, with respect to children, includes the parents' income, the parents' level of education, and the prestige of the parents' occupation(s). Because such information often is not available when conducting school research, Chapter 17 status, qualification for free or reduced lunch which is based on the level of household income, is often used as a relative crude indicator of SES. (Vol.VIII, 1744–45).

235. Dr. Walberg also concentrated on factors related to socioeconomic status including the home environment, behaviors evidenced by parents in the home, and psychological factors such as motivation. Such factors relate to the amount of attention given to children in the home that stimulates the child's intellectual development and motivation and gives the child a learning advantage in school, either before the child starts school or during the school year. Behaviors associated with such factors include reading to the child at a young age, having the child read to the parent, watching and discussing educational television programs with the child, taking the child to the library, and exposing the child to cultural activities to nurture a child's cognitive development. (Vol.VIII, 1745–46).

236. In general, children reared in lower socioeconomic status tend to be less intellectually stimulated and, consequently, tend to be less prepared for school which ultimately impacts on the child's achievement. (Vol.VIII, 1757).

237. Almost 80 percent of the students in the Cleveland Public Schools are eligible for free or reduced lunches, which is a very high indicator of poverty and represents the highest poverty rate among the eight largest cities in Ohio (Akron, Canton, Cincinnati, Cleveland, Columbus, Dayton, Toledo and Youngstown) which were studied. (Vol.VIII, 1808).

238. Dr. Walberg testified that, when assessing virtually all measures of socioeconomic status, including adults over 25 years of age lacking a high school diploma, families with children in poverty households with incomes less than $25,000, households headed by single parents, unemployed persons age 16 or older, single parent families, low birth weight, persons receiving AFDC, teen fertility rates, infant mortality rates, and adult arrest rates, substantial differences exist between African–American and white students, with African–American students being in a more adverse socioeconomic status than white students. (Vol.VIII, 1803–1804).

239. Factors associated with low socioeconomic states related to the child's preschool years, such as low birth weight, childhood anemia, coming from a family with a single parent, and being an unwed mother may also have a profound effect on students once they enter school. (Vol.VIII, 1757–58).

240. Such statistical indicators of socioeconomic status substantially impact student learning. African–American students, living under more adverse SES factors than white students, would be expected to do less well because of such poverty related conditions. (Vol.VIII, 1805).

241. Dr. Walberg's conclusions are based upon averages and means when referring to African–American and white students, not upon individual students; the findings relate to statistical trends rather than absolutes. (Vol.VIII, 1736).

242. Programs such as Federal Chapter I or Title I, designed to address the academic disadvantages of children of lower socioeconomic status, have had limited effectiveness, and may actually be disadvantageous. (Vol. VIII, 1777–78).

243. Both Dr. Walberg and Dr. Armor testified that an "achievement gap" of varying degrees exists between African–American and white students at various ages in virtually every school system throughout the United States in reading, mathematics, and science. This gap is evidenced in each year that national scores were compared. (Vol. VIII, 1740–42; Vol. XI, 2271)(Defs.' Ex. 345, F).

244. The achievement gap for reading in Ohio is 23 points; the average national gap for fourth grade students is between 20 and 30 points. (Vol.VIII, 1743).

245. Dr. Walberg examined the eight largest urban cities in the State of Ohio (Akron, Canton, Cincinnati, Cleveland, Columbus, Dayton, Toledo and Youngstown), and concluded that in Cleveland reading scores, the achievement gap is 1.2 at the fourth grade level, 1.3 at the sixth grade level, and that no gap exists at the ninth grade level. At the fourth grade level, the only city with a smaller achievement gap is Canton. At the sixth grade level, only Canton and Dayton have smaller achievement gaps. (Vol.VIII, 1800–01)(Defs.' Ex. 345, N).

246. High student mobility, more prevalent among low income students, also adversely affects academic achievement and the adverse effects are greater for poor children than for middle class children. (Vol.VIII, 1771–72).

247. The "Matthew Effect" refers to the phenomenon that often students in less favorable socioeconomic status fall further and further behind in school over time. However, in Cleveland, Dr. Walberg stated that the "Anti–Matthew Effect" occurs, a student's performance does not decrease as that student proceeds within the District. (Vol.VIII, 1764).

248. The achievement gap does not increase as students remain in the District. (Vol.VIII, 1822).

249. Strong evidence that no racial discrimination exists with respect to reading or other achievement in the Cleveland Public Schools is found in the fact that the achievement level of African–American students in Cleveland at all grades is very close to that of white students and that the gap diminishes over time. Socioeconomic factors explain the lower academic achievement. (Vol.VIII, 1805–06).

250. Dr. David Armor is an expert in the areas of school desegregation, educational achievement and statistical analyses of educational and social data. Over the past thirty years, Dr. Armor has conducted research on

approximately 30 to 35 school districts and has served as an expert on desegregation-related matters for these districts. Much of his recent work has involved assisting school districts seeking unitary status, which has required him to analyze many court orders and a great deal of data concerning the elimination of vestiges to the extent practicable. Dr. Armor prepared an expert report and a rebuttal report which were admitted into evidence as Defendants' Exhibits 342 and 347. (Vol.XI, 2248–50, 2256).

251. Dr. Armor evaluated academic achievement of students in the District to determine whether any vestiges of past discrimination remain.

252. Similar to Dr. Walberg's findings, Dr. Armor notes that his research results are based on aggregate student performance and thus, results of any individual student may vary; the results are based upon group differences, not individual differences. (Vol.XI, 2264–65).

253. The achievement gap in Cleveland is 6 points. The national or average achievement gap between the scores of black and other students is 20 points. The national gap is about 3/4 to a full standard deviation.[12] (Vol.XI, 2266, 2271–72).

254. The achievement gap between African–American and White students in Cleveland is smaller than the gap in other cities and nationally. (Vol.XI, 2273).

255. In comparing the achievement gap in Cleveland between African–American and white students to achievement gaps in other districts which are either seeking or which have attained unitary status, Dr. Armor testified that the achievement gap in Cleveland is the smallest gap he has ever seen. (Vol. XI, 2266, 2274–75)(Defs.' Ex. 342).

256. Neither the racial composition of a school nor the concentration of poverty in schools has a significant adverse effect on achievement after accounting for individual socioeconomic status. (Vol.XI, 2267, 2278–84).

257. Even without controlling for SES factors, there is no significant relationship between the concentration of students in poverty and achievement of 5th or 10th grade students on the reading and mathematics components of the California Achievement Test ("CAT"). (Vol.XI, 2267–68, 2285–87)(Defs.' Ex. 342).

258. Academic achievement is defined in accordance with scores from achievement tests administered by the District, including the Ohio proficiency tests and the California Achievement Test ("CAT"). (Vol.XI, 2261–62).

259. With regard to the percentage passing all four of the 9th grade proficiency areas at grades 8, 9, 10, 11 and 12, a relatively small gap exists between black and other students. Over 90 percent of both black and white students passed the reading, writing and citizenship proficiency tests by the end of the 1995–1996 and 1996–1997 school years. A gap does exist, however, with regard to the math component of the proficiency test that favors white students. (Vol.XI, 2266, 2275).

260. Based upon CAT results, African–American 5th grade students score close to the national norm in reading and at the national norm in mathematics; these students have an average CAT reading score of 44 points, which is 6 points below the national norm, and an average CAT mathematics score of 50 which equals the national norm. (Vol.XI, 2269)(Defs.' Ex. 342).

261. White students score only 6 points higher on the 5th grade reading and math tests, which is 1/4 of a national standard deviation. This compares to a national gap of better than 3/4 of a standard deviation on the National Assessment of Educational Progress (NAEP). (Vol.XI, 2271)(Defs.' Ex. 342).

262. This small gap is partially the result of the relatively small poverty gap evidenced by the free lunch indicator, 78 percent of black students and 63 percent of white stu-

---

12. Dr. Armor defines a standard deviation as a measure of the variable of a test. He notes that, in general, particularly at the elementary grade levels, students gain approximately one standard deviation per year such that a variance of one standard deviation roughly translates to one year with respect to grade equivalents. (Vol.XI, 2271–72)(Defs.' Ex. 342).

dents receive free lunch. (Vol.XI, 2272–73)(Defs.' Ex. 342).

263. Dr. Armor examined SES factors as part of his research because of their influence on achievement results. Dr. Armor reviewed two factors, receipt of free lunch and family structure (single parent or two parent family), as these were the only individual variables available for a series of years with respect to the Cleveland District. ( Vol. XI, 2263–64).

264. Dr. Armor testified that given the SES differences that exist at the present time in Cleveland, as in other parts of the country, the achievement gap in Cleveland is very small and he does not believe it is practicable to reduce the gap to any significant degree below this current level. (Vol. XI, 2329).

265. Dr. Armor also testified that based upon research of other school districts that have been declared unitary, Cleveland is performing better in terms of black achievement and the achievement gap than other cities recently declared unitary. (Vol.XI, 2329).

266. The Parties stipulated that Dr. William Trent was an expert in educational sociology, statistical analysis, school desegregation, and the effects of race on student achievement. (Vol.XVI, 3019).

267. In 1993, Dr. Trent constructed a list of variables and designed an analysis which Dr. Hawkins, who did not testify at this Hearing, used to conduct a statistical analysis of the District to determine if any vestiges of past discrimination existed. This analysis was based upon interviews, which were conducted in 1993 and 1994, and data for the 1991–1992 school year. Dr.Trent compiled a report based upon the interviews and data but never completed this report (hereinafter, "Draft Report"). (Vol.XVI, 3023, 3072–73).

268. Dr. Trent testified that he concluded in his Draft Report that, as of March of 1994, vestiges of discrimination existed with respect to reading and mathematics. (Vol.XVI, 3073).

269. Plaintiffs stipulated that the Court should strike all portions of Dr. Trent's report related to anything other than mathematics or reading, including suspensions, ex-pulsions, program placement, and faculty racial composition, because Dr. Trent had no data to support his conclusions in those areas. (Vol. XVI 3098–99, 3102–03).

270. Dr. Trent stated that he was contacted by Plaintiffs to prepare the expert report he submitted for this hearing (hereinafter, "Current Report") approximately three days before it was due and that the Current Report is essentially identical to his Draft Report of March 1994. The Current Report was admitted as Plaintiffs' Exhibit G. (Vol. XVI, 3073–74, 3108).

271. Dr. Trent testified that he did not review any data from years subsequent to 1991–1992 in preparing his Current Report and testimony, nor had he interviewed any District employees since March of 1994. (Vol.XVI, 3074).

272. Prior to submitting his Current Report, Dr. Trent testified that he had not reviewed the Consent Decree, the outstanding remedial orders or any documentation regarding Defendants' efforts to comply with the remedial orders. (Vol.XVI, 3074–75).

273. Dr. Trent acknowledged that his Current Report does not contain a review of literature, research findings, or references to scholarship (Vol.XVI, 3028–29).

274. Dr. Trent testified that he had not considered any data of any type regarding the Cleveland Public Schools since 1993. (Vol.XVI, 3075).

275. Dr. Trent testified concerning his statistical analysis of the effect of race on California Achievement Test scores in reading and mathematics in 1992, adjusted for student background factors such as sex, age and free-lunch status, for prior performance in school, and school size and poverty level. (Vol.XVI, 3029–30, 3038–39).

276. Dr. Trent testified that the effect of race on CAT scores, what he termed the "race effect", remained statistically significant after adjusting for these other factors. (Trent Vol. XVI, 3031:18–25).

277. Dr. Trent did not review or consider any results from the Ohio Proficiency Tests. (Vol.XVI, 3080).

278. Dr. Trent acknowledged that the race effect is not synonymous with racial discrimination, and that the race effect may be caused by factors other than racial discrimination. (Vol.XVI, 3095–96).

279. Dr. Trent testified that he could not specify what percent of the race effect is caused by racial discrimination as opposed to some other factor. (Vol.XVI, 3096).

280. Dr. Trent testified that he could not give the Court any comparison of actual performance between African–American and other students in the District. (Vol.XVI, 3083–84).

281. Dr. Trent controlled for only one socioeconomic variable: free lunch status. Dr. Trent acknowledged that other factors may impact achievement that he did not consider, such as family structure, home environment, nutrition level, amount of time spent reading, family income, unemployment rates and birth rates. (Vol.XVI, 3084–87).

282. Dr. Trent stated that he had not conducted a statistical analysis to compare the race effect in Cleveland with the race effect in other school districts he has studied or the race effect in the nation. (Vol.XVI, 3090, 3093–94).

283. Dr. Trent testified that he was not aware of any school district in which no race effect exists. (Vol.XVI, 3095).

284. Dr. Trent testified that with regard to the achievement gap, he did not know how the District compared to other school districts nationally. (Vol.XVI, 3094–95).

285. Dr. Trent testified that the panel on which he served in Prince George's County concluded that African–American students scored consistently lower than other race students on all four standardized tests. (Vol. XVI, 3107).

286. Based on the testimony of all experts, neither racial discrimination nor vestiges of prior discrimination explains the persistent achievement gap between African–American and white students. Rather, this difference is attributable to socioeconomic differences between African–American and white students in Cleveland, the State of Ohio, and the United States.

*CONCLUSIONS OF LAW:*

92. The Court specifically stated in its Remedial Order of February 6, 1978 that:

[t]he Court is persuaded that lower performance scores in schools with a predominance of black students, though partially explainable by the factor of poverty, are mainly the result of differing racial treatment. Therefore, the Court finds that the reading deficiencies, demonstrated by defendants' reports of test scores…are directly and substantially attributable to factors involving racial discrimination.

*Reed v. Rhodes,* 455 F.Supp. at 599.

93. The outstanding remedial obligations in the area of the Affirmative Reading Skills Program consist of the following:

a) In order to remedy the effects of past discrimination, the defendants shall institute an affirmative reading skills program which does not resegregate… (Order, 2/6/78);

b) The Affirmative Reading Skills Program shall:

Be coordinated, for maximum effective results, with the School District's various reading programs and services. Such coordination shall be verifiable. (Order, 4/24/81);

c) The Affirmative Reading Skills Program shall:

Consist of identifiable elements, including but not limited to goals, performance objectives, instructional programming and/or services, assessment, staff training, parent involvement, and clear lines of responsibility and accountability. Such elements shall be verifiable in the plans for and in the operation of these programs. (Order, 4/24/81);

d) The required Affirmative Reading Skills Program shall:

Identify those students in Grades 1 through 12 who have in the past been adversely affected by segregated programming, and be available, at a mini-

mum, to all such students. (Order, 4/24/81);

e) The required Affirmative Reading Skills Program shall:

Be directed *in the program's primary effects* at those students identified as having been adversely affected in the past, even though the program may be provided to all students. (Order, 4/24/81);

f) The required Affirmative Reading Skills Program shall:

Be measured in terms of effectiveness, by its effect on *those students identified initially,* even though programs and services may be provided to all students. The District's evaluative systems shall reflect this focus. (Order, 4/24/81);

g) The Remedial Order requires the Defendants to "conduct an additional study to determine the nature and extent of disparities in the reading skill test scores of minority and white pupils..." (Order 2/6/78);

h) The required study of disparities by race in reading proficiency shall be used by the District to guide, refine and to measure its affirmative reading skills program. The nature and extent of the study's use for these purposes shall be documented. (Order, 4/24/81);

i) Final Standards require that the District's Affirmative Reading Skills Program "[h]ave documented results." The intended nature of such results was spelled out more explicitly by the Court: [T]here would be no value in requiring the district to implement an Affirmative Reading Program if the Court and plaintiffs were not interested in affirmative results in the reading abilities of students affected by the defendants' constitutional violations. (Order, 6/28/82).

94. On May 8, 1996, the Court concluded that Defendants had implemented "a creative educational curriculum, including innovative reading and other programs and initiatives designed to correct, to the extent reasonably practicable, the effects of segregated schools," which has been "introduced into the Cleveland School District in the form of the community-wide acclaimed Vision 21, and implemented for at least two years by a totally integrated administrative and certified supervisory and teaching staff." *Reed v. Rhodes,* 934 F.Supp. at 1551–52.

95. The Defendants have continued to comply with the Affirmative Reading Skills component.

96. Defendants have implemented an affirmative reading skills program which does not resegregate. The reading skills program is coordinated and includes identifiable goals, performance objectives, instructional programming and services, assessment, staff training, parent involvement and clear lines of responsibility and accountability.

97. The District's Affirmative Reading Skills Plan, filed on April 20, 1982, defines adversely affected students as those students who: (1) attended a one-race school as of October 1978; (2) scored below the 34th percentile in comprehension on the Comprehensive Test of Basic Skill; and (3) demonstrated below average familiarity with standard English. Based upon this criteria, no "adversely affected students" currently remain in the District.

98. Plaintiffs allege that Defendants have not complied with their remedial obligations related to the Affirmative Reading Skills component for four reasons: (1) Defendants have not achieved reading parity; (2) poor reading performance is a "vestige" of prior discrimination; (3) Defendants have not utilized parity results to structure the Reading Program; and (4) the Reading Program has not been established and defined. (*Plaintiffs' Brief in Opposition,* at 13–14). Plaintiffs' allegations are without merit.

99. Nationally, a consistent disparity in reading scores exists within all urban districts between the performance of African–American and other students. Such a parity gap, without more, is not evidence of discriminatory conduct or a vestige of prior discrimination.

100. A specified level of "academic achievement" is not a remedial obligation imposed upon the Defendants. However, as the Court originally found that reading defi-

ciencies in the District were the result of the dual system, Defendants must rebut the presumption that any current disparities are the result of Defendants' unconstitutional conduct. *Jenkins,* 122 F.3d at 593, 598.

101. Socioeconomic factors strongly impact upon academic performance, unfortunately the nation is plagued by this reality. The Cleveland Public School District is severely impacted by adverse socioeconomic conditions which hinder the learning of all children, regardless of their race. Defendants have successfully rebutted the presumption of causation through Dr. Armor's expert testimony identifying socioeconomic factors as the primary cause of disparities in achievement between African–American and other students.

102. Although an achievement gap of varying degrees does exist in Cleveland at many grade levels, the achievement gap does not increase as a student remains in the District. It actually decreases at almost every grade level. This strongly suggests that any disparity in achievement is not the result of racial discrimination.

103. The testimony of Defendants' experts ultimately establishes that any achievement gap is not the result of racial discrimination.

### *MANAGEMENT AND FINANCE*

#### *FINDINGS OF FACT:*

287. Dr. James Van Keuren, the Chief Financial Officer for the Ohio Department of Education, is responsible for the State Defendants' compliance with financial remedial obligations. (Vol.X, 2189–91).

288. Robert Hacking, the Budget Director for the District, is responsible for allocating District funds as well as compiling, monitoring, and implementing the District's budget. (Vol.XII, 2392–93).

289. The total operating budget of the District on a yearly basis is approximately $500 to $525 million. (Vol.XII, 2398).

290. Since 1995, the Defendants have allocated the following amounts in carrying out their remedial obligations: approximately $100 million in Fiscal Year 1995; $85 million

in Fiscal Year 1996; and $85 million in Fiscal Year 1997. (Vol.XII, 2394).

291. The District's operating debt for fiscal years 1993 to 1997 was as follows: 1993, $76 million; 1994, $117 million; 1995, $142 million; 1996, $152 million; and 1997, $155 million. (Vol. X, 2193–94; Vol. XII, 2398).

292. The District sought and obtained emergency loans in the amounts of $25.5 million in fiscal year 1995 and $42.1 million in fiscal year 1996. (Vol.X, 2194).

293. When seeking an emergency loan, the District has a statutory obligation to submit plans to the State Controlling Board for expenditure reductions. In general, the planned reductions must equal the amount of the loan requested. (Vol.X, 2194–95).

294. The financial condition of the District continued to deteriorate and expenditure reductions were required in the following amounts: $25 to $30 million in 1994, $42 million in 1995, and $30 to $35 million in 1996. (Vol.XII, 2399).

295. Prior to the passage of the levy in 1996, the last time an operating levy passed was in 1983. (Vol.XII, 2399).

296. The Consent Decree specifically identifies the need to place levies before the electorate. Revenue generated from the passage of such levies would be used to help fund provisions of the Consent Decree. (Vol. XII, 2405).

297. Dr. Richard Boyd, a Superintendent with a great deal of professional experience in working with public school districts, described the financial condition of the Cleveland Public Schools that existed in April 1995 "as being absolutely the worst in the United States." (Vol.XIII, 2539–40).

298. Dr. Richard Boyd testified that "the most painful thing [he's] ever done in [his] whole professional career was to make decisions to cut things that [he] knew were important and worthwhile and shouldn't be cut ... It just didn't make sense at all, ... but [the District] didn't have the money to pay for them." (Vol.XIII, 2552).

299. Reductions were made in all areas, including administrative staff, certified staff,

classified staff, transportation, safety and security, special services, elementary reading and guidance, full day kindergarten, attendance officers and the closure of buildings. (Vol.XII, 2400).

300. Defendants made good faith efforts to ensure that the reduction plans did not adversely impact their ability to comply with outstanding remedial obligations and made expenditure reductions first from General Fund programs (Fund 1). (Vol.XII, 2396–97).

301. As the District's financial condition worsened, it became necessary to consider the funds used for remedial obligations (Funds 12 and 72). (Vol.XII, 2397).

302. Prior to submitting plans to reduce expenditures, Defendants worked with legislators and members of the State Controlling Board to make known the need to avoid interference with the outstanding remedial obligations of this case. (Vol.X, 2196–97).

303. Prior to making reductions, the District reviewed and discussed the expenditure reduction plans with Plaintiffs and OSMCR. Plaintiffs and OSMCR were notified of these proposed reductions or deferrals before they were made, and were given the opportunity to discuss alternative areas in which to make reductions. (Vol.XII, 2401, 2409–12)(Defs.' Ex. 287).

304. The Defendants also advised the Cleveland community of the proposed reductions, and provided an opportunity to discuss the reductions. (Vol. XII, 2403; Vol. XIII, 2541).

305. The Defendants' remedial obligations have been protected from fiscal austerity measures to the extent practicable. (Vol.XII, 2396).

306. The State Defendants have also taken measures to increase revenues and reduce costs for the District, particularly as related to Medicaid reimbursements, purchasing natural gas in bulk, reducing short term borrowing, restructuring of debt, and using competitive bidding in securing emergency loans. Restructuring of the District's debt will result in approximately $70 million being placed back in programs over a ten-year period. (Vol.X, 2200–02).

*CONCLUSIONS OF LAW:*

 104. The remedial obligations concerning Management and Finance are identified in various orders of the Court. (*Order*, 4/24/81; *Order*, 7/8/82; *Order*, 8/14/87; *Order*, 12/9/87; *Order*, 5/25/94, § 7, § 8, § 12). The Parties have stipulated that the Defendants have complied with all remedial obligations related to Management and Finance, including those contained in the Consent Decree, except those obligations related to whether remedial obligations were protected from fiscal austerity measures and whether programs delineated in Appendix B of the Consent Decree were reduced pursuant to § 4.2 of the Consent Decree. (Vol.X, 2185).

105. The Parties have stipulated that the Defendants have complied with all remedial obligations related to facilities, including those contained in the Consent Decree and those contained under the component Obligations of State Defendants. (Vol.X, 2185, 2188).

106. Pursuant to the Parties' stipulation that the Court should vacate Final Standard, XIIIA, which is contained in the Court's Order dated April 24, 1981 and governs cluster organization, (Vol.X, 2186–87), the Court hereby vacates this Final Standard.

107. On February 1, 1996, the Court noted that the Cleveland City School District has "fiscal and administrative credibility, responsibility, and integrity, and a capability to support its educational mission and court-imposed desegregation responsibilities." *Reed v. Rhodes*, 934 F.Supp. 1459, 1465 (N.D.Ohio 1996) (Krupansky, J.).

108. Defendants' remedial obligations have been protected from fiscal austerity measures to the extent practicable. Based upon the testimony rendered at the hearing, the desperate financial condition of the District, prior to the passage of the November 1996 levy, is undeniable. At the time the State assumed "supervision and operational, fiscal and personnel management of the District," pursuant to the Court's Order of March 3, 1995, the District's debt-to-revenue ratio was 25%, the highest in the state among comparable districts. Moreover, the Dis-

trict's operating debt peaked in fiscal year 1997 at $155 million. Dr. Richard Boyd, the Superintendent of the District acknowledged that Defendants were forced to reduce and/or even eliminate some extremely important and beneficial programs based upon the District's deplorable financial condition. In light of the above, the Court concludes that Defendants exhibited a substantial good faith effort to comply with this remedial obligation to the extent practicable.

109. Programs delineated in Appendix B of the Consent Decree were reduced pursuant to § 4.2 of the Consent Decree. Plaintiffs allege non-compliance with the Management and Finance component based, in part, upon Defendants claimed reliance upon § 4.2 of the Consent Decree as the reason for not fully implementing the programs delineated in Appendix B. Plaintiffs assert that despite the language of § 4.2 which provides that the Parties shall be consulted before any changes are made with regard to implementation of Vision 21 programs as described in Appendix B if the District "believes that for financial or other reasons it is unable to implement them," Plaintiffs fully expected both the letter and the spirit of the remedial orders and the Consent Decree to be fulfilled. The Court concludes that the record clearly establishes that the District's financial condition demanded that many reductions be made and that some forecasted programs be delayed. Defendants conduct of reducing or not implementing programs based upon financial constraints was contemplated by all of the Parties to the Consent Decree as § 4.2 clearly contemplated such events. Such a provision was only reasonable based upon the financial condition of the District at the time all Parties agreed to the terms of the Consent Decree. Certainly, the financial condition of the District was a reality that could not be ignored. All Parties and the Court fully expected the letter and the spirit of the remedial orders and the Consent Decree to be implemented. Unfortunately, until the passage of the November 1996 operating levy, the financial condition of the District continued to deteriorate and the District desperately lacked the funds necessary to implement various provisions of the Consent Decree.

110. Plaintiffs also allege non-compliance with regard to the Management and Finance component by asserting that Defendants have failed to develop a plan to bring "receivership" to an end and have not formalized the procedures to streamline Defendants' reporting obligations. (*Plaintiffs' Brief in Opposition*, at 18–19). With regard to Defendants' reporting obligations, Plaintiffs never raised such a concern to the Court either before or during the hearing. Additionally, no remedial order requires Defendants to develop a plan to bring receivership to an end. Plaintiffs' allegations of non-compliance are without merit.

## OBLIGATIONS OF STATE DEFENDANTS

*FINDINGS OF FACT:*

307. The State Defendants assumed supervision and operational, fiscal and personnel management of the District on March 3, 1995. (Vol.IX, 1999)(Order, 3/3/95).

308. The State Defendants, in cooperation with the other Parties, initiated and developed the *Compliance Management and Reporting Plan* to guide and monitor Defendants' efforts to effect their remedial obligations. Defendants have held regular compliance meetings with Plaintiffs and OSMCR to review outstanding compliance matters. (Vol.IX, 2006).

309. The State Defendants have developed a Positive Action Plan which incorporates the four components identified in the Special Master's Recommendation of 1977:(1) compliance with State minimum standards; (2) realignment of reading funds; (3) development of educational intervention programs related to assuring that students achieve in accordance with grade level; and (4) development of the Strategic Plan for Facilities Improvement (Vol.IX, 2007–08).

310. The Positive Action Plan is incorporated in the *Compliance Management and Reporting Plan*, which was admitted into evidence as Defendants' Exhibit 2. (Vol.IX, 2009)(Defs.' Ex. 2, at 39).

311. With regard to compliance with State minimum standards, the Ohio Depart-

ment of Education completed an on-site inspection of the schools in the Cleveland City School District in April and May 1996, to determine if the schools were in compliance with these standards, as set forth in the Ohio Administrative Code. The Ohio Department of Education concluded that the District complied with 99 percent of the State minimum standards. The District implemented appropriate corrective action by March 1997, the time at which the Department conducted a second inspection of schools. Based on that inspection, the Department concluded that the District was in full compliance with the minimum standards for Elementary and Secondary Schools. (Vol.IX, 2010–15)(Defs.' Ex. 315, 320, 321, 322).

312. With regard to the realignment of reading funds, the State Defendants worked with the District to redirect funds from the general fund (Fund I) to compensatory education funds to be used for the District's reading program. (Vol.IX, 2015–16)(*Joint Stipulation*, filed 1/31/97).

313. Based upon the unrefuted expert testimony presented during the course of this hearing, especially as related to the Testing and Tracking and Affirmative Reading components, examining the impact of socioeconomic factors on learning, the requirement of *assuring that students in the Cleveland school system are achieving in accordance with the grade level to which they have advanced* appears to be an unrealistic standard by which to assess any school district. Nevertheless, genuine good faith compliance efforts have been made in this regard.

314. Although Defendants cannot "guarantee" that students achieve a specified level of achievement, the State Defendants have worked closely with the District to develop educational intervention programs including summer school and the realignment of competency-based education programs targeting improving performance on proficiency exams. (Vol.IX, 2016–19).

315. The State Defendants, working with the District, developed a Strategic Plan for Facilities Improvement relying on both internal and external assessments. From these assessments the State and District have developed a five-year strategic facilities plan for all District buildings which includes a prioritization of the facilities-related needs of the District. (Vol.IX, 2021–25)(Defs.' Ex. 332, 333, 334).

316. Pursuant to the authority granted to the State Superintendent under the March 3, 1995 Order, the State Defendants have taken significant actions in the following five strategic areas: (1) fiscal stability; (2) compliance; (3) operations and systems; (4) safety and security, and (5) facilities management. (*Motion for Unitary Status*, Tab A: *A Report of the State of the Cleveland City School District Since March 3, 1995* )(Vol. IX, 2025–26; Vol. XIII, 2557).

317. The Defendants properly engage in the tripartite review process when implementing changes, particularly related to compliance with remedial orders or the Consent Decree. (Vol.IX, 2029–32).

318. Pursuant to the Proficiency Agreement between the Parties which specifically references the Class of 1994, Defendants have fulfilled their obligations. (Vol.IX, 2035–37)(Defs.' Ex. 171, 173).

319. The State Defendants and District have undertaken major steps to ensure that schools open smoothly each year and have developed a detailed plan to help ensure similar results in the future. (Vol. IX, 2024; Vol. XIII, 2557–58).

320. Dr. Boyd testified that he had communicated with the Board on a regular basis regarding District matters. (Vol.XIII, 2593).

321. Ms. Triplett, Board President at the time of the hearing, testified that Dr. Boyd and other State and District representatives regularly communicated with the Board, and that all inquiries made by the Board were answered. (Vol.XIX, 3720–21).

*CONCLUSIONS OF LAW:*

111. Additional outstanding remedial obligations imposed upon the State Defendants include the following:

a. accountability for compliance with remedial orders;

b. financial responsibility;

c. institution of a positive action program "to inspect and insure that all schools

in the Cleveland District meet and maintain State minimum standards;"

d. administrative planning;

e. student transportation system;

f. management systems review;

g. modification of remedial provisions; and .

h. description of educational outcomes. (*Order,* 2/6/78; *Order,* 5/16/79; *Order,* 6/4/84; *Order,* 12/9/87; Consent Decree, 5/25/94, §§ 7, 12, 13).

112. On February 1, 1996, the Court acknowledged the State Defendant's progress since the March 3, 1995 Order took effect. The Court noted the following:

Together, Drs. Sanders, Boyd and … Goff, aggressively pursued the tedious, thankless and seemingly insurmountable emergency by interim and long-range implementation of their commitments to restore the fiscal and administrative capability of a bankrupt school system in disarray into a system with fiscal and administrative credibility, responsibility, and integrity, and a capability to support its educational mission and court-imposed desegregation responsibilities.

*Reed v. Rhodes,* 934 F.Supp. at 1465.

113. The State Defendants have continued to implement the remedial orders and oversee compliance. The Parties worked in a cooperative effort to develop the *Compliance Management and Reporting Plan* to guide and monitor Defendants' compliance with the outstanding remedial orders. Furthermore, Defendants have met with Plaintiffs and OSMCR on a regular basis to review outstanding compliance matters.

114. With regard to the State Defendant's financial responsibilities, Plaintiffs stipulated that the State Defendants have complied with the financial obligations imposed upon them. (Vol.X, 2185).

115. Defendants have developed and implemented a Positive Action Plan, as defined by the Special Master's Recommendation of 1977 and the Court concludes based upon unrefuted expert testimony that Defendants have complied to the extent practicable with this remedial requirement.

116. State Defendants' remedial obligations related to administrative planning were vacated by the Order of January 3, 1995.

117. On July 28, 1997, Plaintiffs stipulated that the Defendants complied with their remedial obligations related to the Transportation component, including those related to student transportation systems, which were specifically imposed upon the State Defendants. (*Order,* 10/3/97).

118. Ongoing implementation of the management systems review process was vacated by the Court's Order of May 25, 1994. (Order, 5/25/94, § 12.4).

119. Defendants have continued to engage in the tripartite review process and to report all tripartite changes to the Court.

120. The Parties have proposed modifications to the remedial orders.

121. The Proficiency Agreement of May 13, 1994 does not require any specified level of achievement on the Ninth Grade Proficiency Test and Defendants have satisfied the requirements of this Agreement.

122. Plaintiffs have only asserted that the State Defendants have failed to comply with their obligation to institute a Positive Action Plan. (*Plaintiffs' Analysis of Defendants' Remedial Compliance,* 7/28/97; *Plaintiffs' Brief in Opposition,* 8/18/97).

123. Defendants have failed to provide a description of educational outcomes as required pursuant to the Consent Decree. Such educational outcomes are long overdue and must be submitted to the Court by October 1, 1998. Ohio Revised Code § 3311.74 also makes reference to setting educational goals and this requirement must be satisfied.

## CONSENT DECREE AND VISION 21

### FINDINGS OF FACT:

322. The District appointed Richard Nielson as the Senior Executive Manager of Desegregation Compliance responsible for implementing Defendants' remedial compliance efforts. Mr. Nielson reports directly to the Deputy State Superintendent of the District. The individuals responsible for compliance

with the particular components report to Mr. Nielson and provide him with information relative to such compliance efforts. (Vol. XIII, 2542–43).

323. The State Defendants assigned Dr. Steven Puckett, Assistant State Superintendent of Public Instruction, to monitor compliance with the remedial orders, the Consent Decree, and the Order of March 3, 1995. (Vol. I, 57; Vol. IX, 1998–99).

324. Dr. Livesteen Carter is the District's Chief Academic Officer and is directly responsible for implementation of Vision 21. (Vol.VI, 1411)

325. Robert Hacking is the Director of the District's Budget Division and is responsible for allocating funds to Vision 21. (Vol. XII, 2392–93).

326. The Consent Decree remains in effect until July 1, 2000. Pursuant to the language of the Consent Decree, Section 11 requires Defendants to demonstrate compliance with that particular Section by July 1, 1997. The Court addresses the various components of Section 11 throughout this opinion and will, therefore, not address the Section separately.

327. The Parties specifically discussed during Consent Decree negotiations the possibility that sufficient funding might not be available to implement all provisions of the Vision 21 programs set forth in Appendix B to the Consent Decree. (Vol.XII, 2405).

328. At the time the Consent Decree was approved, Plaintiffs' class representatives drafted a response to the Vision 21 program and noted that "funding was not in place to implement Vision 21 and success could not be guaranteed immediately or over the coming years." The response was admitted into evidence as Plaintiffs' Exhibit BBBB. (Vol.XVII, 3610).

329. Plaintiffs' class representatives testified that they were aware that implementation of Vision 21, as set forth in Appendix B of the Consent Decree, was conditioned upon the passage of a levy. (Vol.XVIII, 3664).

330. The Parties also specifically discussed and agreed that provisions of Appendix B could not be fully implemented without the passage of a local levy. (Vol.XII, 2405)(*See Order*, 5/25/94, § 4 .2).

331. Defendants' Exhibit 335 and the *Parties Joint Report Regarding Implementation of the Consent Decree*, filed 1/31/97, accurately reflect the funds proposed and actual/projected for implementation of Vision 21 as set forth in Appendix B of the Consent Decree.

332. Pursuant to the Section 1 of Appendix B to the Consent Decree, the District has a uniform grade structure in place including a middle school structure of grades six through eight. The Middle School programs have been effectively implemented, and additional teachers were hired to satisfy the 19 to 1 staffing ratio. (Vol.XII, 2407, 2458).

333. Additional security guards were also added to accommodate these programs. (Vol.XII, 2459).

334. Youth resource coordinators were initially added, and then had to be eliminated during the 1995–96 school year, due to budget constraints. Full time parent liaisons and additional staff funded through Title 1 have been added to assist in meeting the needs of the middle school students. (Vol. XII, 2459–60).

335. Additional foreign language teachers have also been added to the Middle Schools as a result of funds generated by the passage of the levy. (Vol.XII, 2461).

336. The Parties anticipated that approximately $57 million would be spent for the Middle School programs set forth in Appendix B. Actual and projected expenditures total $50.9 million. (Vol.XII, 2406–07)(Defs.' Ex. 335, at 1).

337. Pursuant to Section 2 of Appendix B, the capacity of the magnet school program has been substantially expanded, and the program has exceeded the goal set forth in Appendix B. The District's magnet school program has capacity to serve 15,500 students. (Vol. XII, 2407; Vol. XII, 2461).

338. The District offers twenty magnet themes at thirty-six schools which exceeds the goals set forth in Section 2 of Appendix B. (Vol.XII, 2462).

339. Additional specialized staff, librarians, and program coordinators have been hired to support these additional magnet school offerings. (Vol.XII, 2462).

340. In order to avoid reductions in the magnet school program, the State Defendants and District sought and obtained additional grant funds to enable them to meet the goals set forth in Appendix B. (Vol.XII, 2408).

341. The Parties anticipated that approximately $13 million would be spent for the magnet school programs set forth in Appendix B. Actual and projected expenditures total $13.1 million. (Defs.' Ex. 335, at 2).

342. Pursuant to Section 3 of Appendix B, the community model school program was initially implemented, but had to be deferred due to financial constraints. Specifically, full-day kindergarten programs were implemented but then had to be deferred for two years until after passage of the levy. Such programs were reinstituted in all community model schools in the 1997–1998 school year. (Vol.XII, 2266–67, 2409).

343. All of the community model school programs set forth in Section 3 of Appendix B have now been implemented. (Vol.XII, 2464).

344. The District has hired additional specialized staff to implement the community model school programs, including additional teachers to implement full day kindergarten. (Vol.XII, 2467).

345. The Parties anticipated that approximately $63 million would be spent for community model schools as set forth in Appendix B. Actual and projected expenditures total $39.5 million. (Defs.' Ex. 335, at 3).

346. With regard to Section 4 of Appendix B, the goals of the affirmative reading program have not been fully met, due, at least in part, to a lack of funding. Preschool programs which were an anticipated precondition were not implemented due to financial constraints. (Vol.XII, 2468).

347. Reading programs were also reduced due to funding constraints. (Vol.XII, 2410).

348. The Defendants have implemented a series of nationally recognized reading programs for first graders to implement the goals set forth in Section 4 of Appendix B. A one-on-one tutoring program was also initially implemented but was eliminated due to financial constraints. (Vol.XII, 2469–70, 2472).

349. The first grade reading programs are a part of the District's affirmative reading skills program which incorporates functional development, proficiency testing, support for students who are performing below District standards, compensatory resources and consideration of parity studies. (Vol. XII, 2470–71).

350. The Parties anticipated that approximately $25 million would be spent for reading programs as set forth in Appendix B. Actual and projected expenditures total $9.8 million. (Defs.' Ex. 335, at 4).

351. Pursuant to Section 5 of Appendix B, full-time guidance counselors and additional clerical support were initially provided in all elementary schools but both were eliminated due to budgetary constraints. (Vol. XII, 2411, 2473–74).

352. Additional professional training for the current counseling staff, as set forth in Section 5 of Appendix B, is provided; approximately 27 hours of training are provided annually. (Vol.XII, 2474).

353. The Parties anticipated that approximately $32 million would be spent for elementary guidance services as set forth in Appendix B. Actual and projected expenditures total $1.6 million. (Defs.' Ex. 335, at 5).

354. The elementary parent family liaison program set forth in Appendix B was delayed and restructured due to fiscal constraints, but implementation is now as projected, as provided in Section 6 of Appendix B. (Vol.XII, 2411, 2475).

355. The Parties anticipated that approximately $7 million would be spent for elementary parent/family liaison services as set forth in Appendix B. Actual and projected expenditures total $6.8 million. (Defs.' Ex. 335, at 6).

356. With regard to Section 7 of Appendix B, the District has not conducted the two-week professional development program due to financial constraints. The District's professional development program has been significantly enhanced through the use of levy funds. The programs offered will aid District staff in implementing Vision 21. (Vol. XII, 2475).

357. The Parties anticipated that approximately $19 million would be spent for professional development as set forth in Appendix B. Actual and projected expenditures total $24.7 million, although the program will be structured differently from what was contemplated. (Vol.XII, 2412–13, 2476)(Defs.' Ex. 335, at 7).

358. Pursuant to Section 8 of Appendix B, the District has implemented proficiency test improvement programs including: a) summer tutorial programs, although many eligible students elect not to attend; b) in-service training for teachers in the use of technology; c) changing daily schedules at the high school level to reduce study halls and to introduce other learning programs; d) use of alternative learning approaches; e) hiring of additional teachers; and f) proficiency test computer labs. (Vol.XII, 2477, 2480–82).

359. Expenditures for proficiency programs were reduced in 1994–95, 1995–96 and 1996–97 due to financial constraints, but enhanced proficiency test improvement programs have now been implemented. (Vol. XII, 2413).

360. The Parties anticipated that approximately $35 million would be spent for proficiency programs as set forth in Appendix B. Actual and projected expenditures total $25.4 million. (Defs.' Ex. 335, at 8).

361. Additional expenditures for proficiency related technology enhancements will be made which are not reflected in these totals. (Vol.XII, 2414).

362. With regard to Section 9 of Appendix B, the Afri–Centric/Multi–Cultural Infusion Programs were deferred and reduced. (Vol.XII, 2414–15).

363. Additional programs have been implemented and the District has revised its curriculum to support the Afri–C entric/Multi-Cultural infusion aspects of Vision 21, as set forth in Section 9 of Appendix B. (Vol. XII, 2482–83).

364. Additional staff training has been developed and implemented for the Afri–Centric/Multi–Cultural Infusion Program. (Vol.XII, 2483).

365. Selected emergent programs with a particularly intensive Afri–Centric approach have been implemented at two of the community model schools. (Vol.XII, 2484).

366. The District has hired additional staff to support the infusion of the Afri–Centric/Multi–Cultural materials and District teachers have received special training in incorporating such materials in the regular classroom setting. (Vol.XII, 2484).

367. Beverly Lloyd, the Afri–Centric/Multi–Cultural curriculum specialist for the District since 1994, stated that despite budget cuts due to levy failures, the District is making a good faith attempt to satisfy the requirements of Section 9 of Appendix B. (Vol.XVIII, 3568, 3592).

368. The Parties anticipated that approximately $10 million would be spent for Afri–Centric/Multi–Cultural Infusion programs as set forth in Appendix B. Actual and projected expenditures total $.6 million, although the expenditures for these programs as set forth in Exhibit 335 do not reflect the Afri–Centric/Multi–Cultural Infusion Programs in the community model schools. (Vol.XII, 2414–15)(Defs.' Ex. 335, at 9).

369. With regard to Section 10 of Appendix B, school-climate improvement programs were also deferred due to budgetary constraints, although expenditures now are projected to substantially exceed those originally proposed. (Vol.XII, 2415, 2485).

370. Because of these budgetary constraints, the school climate improvement program has been supplemented through other programs. (Vol.XII, 2485).

371. The Parties anticipated that approximately $8 million would be spent for school-climate improvement projects as set forth in Appendix B. Actual and projected expendi-

tures total $11.9 million. (Defs.' Ex. 335, at 10).

372. Section 11 of Appendix B, Improved Public Communication Programs, was also substantially deferred due to financial constraints. (Vol.XII, 2416).

373. The District has now implemented an enhanced public communications function. (Vol.XII, 2486).

374. These efforts include development and distribution of a parent guide, development of parent information centers and interactive voice response systems, and awareness campaigns to explain community model schools. (Vol.XII, 2486–88)(Defs.' Ex. 336, 337).

375. Parent information campaigns to improve awareness of Vision 21 and other educational programs have also been implemented. (Vol.XII, 2489).

· 376. The Parties anticipated that approximately $5 million would be spent for improved public communications as set forth in Appendix B. Actual and projected expenditures total $.9 million, although these amounts do not include the amounts for the funding of the School Community Councils and the District Community Councils. (Vol. XII, 2416)(Defs.' Ex. 335, at 11).

377. Section 12 of Appendix B, additional monitoring and assessment, was also deferred due to budgetary constraints. (Vol. XII, 2417).

378. The District has added additional personnel to monitor Vision 21 programs as set forth in Section 12 of Appendix B. (Vol. XII, 2489–90).

379. The Parties anticipated that approximately $2 million would be spent for additional monitoring and assessment as set forth in Appendix B. Actual and projected expenditures total $3.5 million. (Vol.XII, 2417)(Defs.' Ex. 335, at 12).

380. The Parties stipulated that the Defendants have met their obligations regarding facilities improvements. Actual and projected expenditures total $69.6 million. (Defs.' Ex. 335, at 13).

381. All of the reductions and/or deferrals in the programs set forth in Appendix B to the Consent Decree were discussed with Plaintiffs and OSMCR prior to their implementation.

382. Plaintiffs offered testimony of Plaintiffs' Class Representatives, Rhonda Eberhart, Rashidah Abdul–Haqq, and Richard McCain, as well as that of Board Members, Shirley Hawk, Cynthia Triplett, and Gerald Henley, regarding Defendants' Vision 21 implementation efforts.

383. As a former Plaintiff Class Representative, Rhonda Eberhart testified that based upon her visits to various District schools, she does not believe Defendants are in compliance with the following aspects of Appendix B to the Consent Decree: staffing ratios; expanded guidance services; professional staff development; and Afri–Centric/Multi–Cultural Infusion programs. (Vol.XVIII, 3629, 3636–39). Ms. Eberhart testified she lacked personal knowledge as to Defendants' compliance with various aspects of the following areas: magnet school programs; community model school programs; reading programs; School Climate Improvement projects; and improved public communications programs. (Vol.XVIII, 3631–34, 3640–41). Ms. Eberhart is unaware whether Plaintiffs ever formally filed a complaint as to these areas of alleged non-compliance as required by Sections 13 and 16 of the Consent Decree. (Vol.XVIII, 3649–50).

384. Plaintiff Class Representative, Richard McCain expressed his concerns with the following areas: staff development; student rights; and resegregation. (Vol.XVIII, 3658–61). Mr. McCain testified that no formal complaints were ever filed pursuant to Sections 13 or 16 of the Consent Decree. (Vol.XVIII, 3664).

385. Plaintiff Class Representative, Rashidah Abdul–Haqq testified that, based upon her visits to District schools, Defendants have not fully complied with the following obligations listed in Appendix B of the Consent Decree: staffing ratios; youth resource center coordinators; Community Model Schools; reading programs; expanded guidance services, professional staff development; proficiency test programs; Afri–Centric/Multi–Cultural Infusion programs; and

additional monitoring and assessment. (Vol.XVIII, 3681–89). Ms. Haqq also testified that none of these allegations of noncompliance were ever presented to Defendants pursuant to Sections 13 or 16 of the Consent Decree. (Vol.XVIII, 3706).

386. Board member, Shirley Hawk, testified that as of the 1997–1998 school year, each community model school had a full-day kindergarten program. (Vol.XVI, 3153). With regard to the other areas in which Ms. Hawk had personal knowledge, she testified that professional development programs, proficiency test improvement programs, and Afri–Centric/Multi–Cultural Infusion programs had not been fully implemented due to budgetary constraints. (Vol.XVI, 3155–58).

387. Board member Cynthia Triplett has also previously served as a Plaintiff Class Representative. Ms. Triplett testified that she believes Defendants have complied, to various degrees, with regard to implementation of the following aspects of Appendix B to the Consent Decree: magnet school programs, improved public communications programs; proficiency test improvement programs, staff development, and curriculum reform. (Vol.XVIII, 3487, 3494–3501). Ms. Triplett also testified that, to her knowledge, Defendants were not in full compliance with implementation of Appendix B programs concerning the following components: youth resource center coordinators; community model schools; reading programs; expanded guidance services; parent-family liaison services; Afri–Centric/ Multi–Cultural Infusion programs; and additional monitoring of Vision 21. (Vol.XVIII, 3487–3502). With regard to many of the specified areas of noncompliance, Ms. Triplett identified budgetary constraints as an impediment to implementation. However, Ms. Triplett also acknowledged her responsibility as a Board member, pursuant to the Consent Decree and the March 3, 1995 Order to place an operating levy on the November 1996 ballot and her personal refusal to comply. (Vol.XVIII, 3477).

388. Board member, Gerald Henley, testified that he was fully aware of his responsibilities as a Board member pursuant to the Consent Decree and the March 3, 1995 Or-

der. Nevertheless, he voted against placing a levy on the November 1996 ballot and actively campaigned against it. (Vol.XVII, 3398, 3434, 3441). Mr. Henley had no personal knowledge of Defendants' compliance with Remedial or Consent Decree obligations. (Vol.XVII, 3408–19, 3446–51).

389. Board members, Hawk, Triplett, and Henley, all acknowledged the responsibility of the Board to place an operating levy on the November 1996 ballot. Furthermore, these Board members acknowledged, when questioned by the Court, that passage of such a levy would be crucial to the implementation of Vision 21. Nevertheless, the Board voted against placing such a levy on the November 1996 ballot. (Vol. XVI, 3159–60; Vol. XVII, 3452–53, 3457).

*CONCLUSIONS OF LAW:*

124. Sections 5 and 6 of the Consent Decree, addressing Student Assignments, are no longer in effect as remedial obligations as a result of the Court's May 8, 1996 ruling on Student Assignments. Defendants were not required to submit evidence regarding compliance with these Sections. (Order, 10/3/97).

125. The Parties stipulated that Defendants complied with Sections 7 and 8 of the Consent Decree.

126. Pursuant to Section 2 of the Consent Decree, all other Consent Decree obligations imposed upon Defendants remain in effect until July 1, 2000. (Order, 5/25/94, § 2.2).

127. Vision 21 is a seven-year educational improvement and desegregation plan. (Order, 5/25/94, § 4.1).

128. In May 1994 when the Court approved the Consent Decree, the Parties were aware that implementation of Vision 21 pursuant to the time guidelines set forth in Appendix B was contingent upon the passage of an operating levy. (Order, 5/25/94, § 3).

129. The State Defendants are required to provide financial support only for those programs identified in Appendix B to the Consent Decree. (Order, 5/25/94, § 4.1)

130. The desperate financial condition of the District in existence at the time the Parties signed the Consent Decree prompted

the inclusion of Section 4.2 which provides that "[i]f the District elects not to implement Vision 21 as described in Appendix B, or it believes that for financial or other reasons it is unable to implement them, the Parties shall be consulted before the District commits to any change." (Order, 5/25/94, § 4.2).

131. Pursuant to Section 10 of the Consent Decree, the Parties jointly proposed the vacation of 27 extant remedial orders, such orders were vacated by this Court's Order of January 3, 1995.

132. In accordance with Section 11.2 of the Consent Decree, Defendants have consistently identified bottom quartile schools and, pursuant to Section 11.3, Defendants have implemented appropriate interventions for such schools.

133. Defendants have refrained from racial discrimination and segregation.

134. Based upon the financial condition of the District since the Consent Decree was approved by the Court, Defendants have demonstrated a good faith effort to comply with the terms of the Consent Decree to the extent practicable.

Relying upon the foregoing findings of fact and conclusions of law, derived from the testimony and exhibits produced throughout the course of the hearing, the Court finds that Defendants have complied to the extent practicable with the outstanding remedial obligations and the Consent Decree.[13] Since assuming control of the District pursuant to the March 3, 1995 Order, the State has made great strides in restoring and improving the operational, fiscal and personnel management of the District. The Court especially commends the efforts of Drs. Goff and Boyd for their efforts in this regard; such diligent and able leadership has greatly benefitted the District. Defendants have complied with their outstanding remedial and Consent Decree obligations and, furthermore, have designed and implemented systems to insure that the progress currently underway will continue in the future.

With regard to the issue of vestiges, the Court also finds, based upon the foregoing findings of fact and conclusions of law, that Defendants have eliminated all vestiges of past discrimination and segregation. The Supreme Court has aptly noted:

[i]n one sense of the term, vestiges of past segregation by state decree do remain in our society and in our schools. Past wrongs to the black race, wrongs committed by the State and in its name, are a stubborn fact of history. And stubborn facts of history linger and persist. But though we cannot escape our history, neither must we overstate its consequences in fixing legal responsibilities. The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied.

*Freeman,* 503 U.S. at 496, 112 S.Ct. at 1448. Through the testimony and evidence presented, Defendants successfully rebutted the presumption that any disparities were the result of Defendants' unconstitutional conduct. *Jenkins,* 122 F.3d at 593. Furthermore, no credible or factually supported evidence concerning the presence of such vestiges was presented during the course of the hearing. Based upon the findings and conclusions, the Court, accordingly, finds that all such vestiges have, in fact, been eliminated to the extent practicable.

Ultimately, based upon Defendants' record of compliance, the Court finds that Defendants have demonstrated an affirmative good faith commitment to the entirety of the desegregation plan. As previously noted, Defendants have complied with their obligation to desegregate the District and to eliminate all vestiges of past discrimination and segregation to the extent practicable. Equally as important, and perhaps as indicative of Defendants' "good faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial interven-

13. The Court strongly believes that full appreciation and understanding of the depth of the foregoing findings of fact and conclusions of law demands a thorough reading of the transcript.

As the transcript contains 3,733 pages, the Court is well aware that such an undertaking is a large task, but, nevertheless, a highly worthwhile and informative endeavor.

tion in the first instance," are the types of programs and measures Defendants have implemented to improve the overall stability and operation of the District. *Freeman*, 503 U.S. at 491, 112 S.Ct. at 1446.

## CONCLUSION

This Court is mindful of the fact that the segregative practices found in this district over 20 years ago undoubtedly had a substantial impact that may never be completely remedied by any court order. The remedial obligations delineated in the various orders of this Court identified matters targeted as vital to the desegregation effort. Aided by hindsight, however, this Court is not convinced that the voluminous remedial orders issued in this case benefitted the students of the Cleveland Public Schools to the degree that all Parties and the Court had hoped. As noted by a highly credible and respected expert on desegregation, the District was subject to approximately two to three times more remedial obligations than any other school district subject to a desegregation order. Based upon the twenty year history of this case, the Court cannot help but wonder whether the students would have been better served by placing greater attention on the more important fundamental remedial components as opposed to less attention dispersed among many components. Nevertheless, the remedial obligations imposed served the ultimate goal of bringing the District into compliance with the commands of the Constitution and, in that regard, were highly successful; the purposes of this desegregation litigation have been fully achieved.

The Court is fully aware, however, that the unitary system that currently exists exhibits deficiencies that impact all students regardless of race. Thus, this Court joins in the sentiment of all the Parties that academic achievement levels of all students in the Cleveland Public School District need to improve. Such an acknowledgment, however, does not prevent the Court from declaring the District unitary. Defendants have satisfied their remedial and Consent Decree obligations and have systems in place to insure that violations of the type found in the system over twenty years ago do not reemerge. In fact, as noted by several highly credible expert witnesses, Defendants' record of compliance compares favorably and often exceeds that of other districts recently declared unitary. Moreover, credible expert testimony also established that the gap that exists in Cleveland, as well as throughout the nation, between African–American and white students is the result of socioeconomic status and factors directly related to it, not race.[14] Thus, the Cleveland Public School District is not unlike most other large urban school districts. Nevertheless, solutions must be found to improve academic achievement levels of all students.

Improving educational outcomes of the students in the Cleveland Public Schools requires and demands the efforts of the entire Cleveland community; every individual plays an integral role in the future success of this system. This battle cannot be won by assigning blame for the weaknesses in the system or pursuing individual agendas. Such acts accomplish nothing. Honestly assessing the weaknesses while working collectively and constructively to strengthen the system will improve the Cleveland Public School District at all levels.

At the most fundamental and influential level, children need a home environment conducive to nurturing the mind, body, and spirit. A parent plays a major role in preparing children for school and in helping children to succeed. Parents need to accept their responsibilities as children learn through example.

A few days ago, I had the pleasure of attending *"Grandparents Day"* at a school my grandchildren attend. Children as young as two years old performed for their parents and grandparents. I also watched four year olds exhibit their foreign language skills. The majority of these children come from two parent families with grandparents, aunts and uncles who love them and contribute to their well-being. The parents of these chil-

---

**14.** The Court, relying upon the expert reports submitted, the testimony presented, and the experience and standing of the experts within the expert community, found Defendants' expert witnesses highly credible.

dren recognize the need for good prenatal care, health care, and the importance of reading at an early age. Most notably, these parents understand that the most significant beings in their lives are their children and they are willing to make many sacrifices to help their children succeed. The significance of providing children with a stable foundation cannot be overemphasized.

At the school level, State and District personnel undoubtedly need to provide students of the Cleveland Public Schools a sound education. The District must be governed, managed, and operated responsibly. The District can no longer be governed by an irresponsible school board that does not operate with the best interest of the children in mind; voting against placing an operating levy before the electorate and actively campaigning against the passage of such a levy does not serve the interests of the children.[15]

Finally, at the community level, every individual has a responsibility to contribute to the education of the children of Cleveland. To function as a strong and viable community, individual members of that community must work toward its success. Credible expert testimony has emphasized the role of socioeconomic factors and their impact upon learning. Unfortunately, Cleveland is plagued by a high incidence of adverse socioeconomic factors. Therefore, the task at hand of improving the system is tremendous, but it is also vital to the success of the community as a whole.

Many years ago, I had a conversation with a gentleman in which I expressed the opinion that, after reviewing the pre-sentence reports of many individuals appearing before me who were charged with criminal acts, I was surprised they had not committed more crimes. I explained that many of these individuals did not have the guidance of parents, or a similar figure, during their childhood and/or adolescent years. The gentleman politely disagreed. He stated that he had been raised without the guidance of parents since he was eight years old. Nevertheless, he had been able to lead a successful life. I responded by noting that even though he did not have his parents' support, he must have had someone who gave him a lot of love and guidance during his formative years, unlike the individuals who appeared before me. My friend looked at me, smiled and said, "Judge, you're right."

I am convinced that a child's future success is dependent upon the presence of an adult who genuinely cares about the child and fosters an environment that enables the child to succeed. Whether that adult is a parent, a relative, a friend, a teacher, or simply a concerned member of the community, a child's life eagerly awaits such a positive influence. Cleveland's children can be its greatest and most important asset.

Based upon the foregoing, the Court concludes that Defendants have complied with the extant remedial orders and the Consent Decree to the extent practicable; all vestiges of past discrimination and segregation have been eliminated to the extent practicable; and Defendants have demonstrated a good faith commitment to their constitutional obligations. Accordingly, Defendants' Motion for Unitary Status is hereby *granted.* Defendants are hereby released from all further remedial obligations except those specifically delineated in the Consent Decree to continue until July 1, 2000.[16] At the present time, the March 3, 1995 Order remains in effect, and, thus, the State remains in control of "supervision and operational, fiscal and personnel management of the District." (Order, 3/3/95, at 6).

It is further ordered that a hearing will be held in the near future for purposes of addressing the role of OSMCR and the motion to vacate the Order of March 3, 1995.

IT IS SO ORDERED.

---

**15.** The Court could further elaborate on the numerous inadequacies of the governance provided by the Cleveland Board of Education but the Court believes such an exercise futile in light of this Court's March 6, 1998 Order declaring Substitute House Bill No. 269 constitutional. *Spivey v. State of Ohio,* 999 F.Supp. 987 (N.D.Ohio 1998); *Mixon v. State of Ohio,* 999 F.Supp. 987 (N.D.Ohio 1998).

**16.** As previously stated, Defendants must submit a description of educational outcomes to the Court by October 1, 1998.

## APPENDIX A

### Economic and Social Indicators for Blacks and Whites Living in The Cleveland Public School District

#### A report submitted by:

/s/ Neil Bania

**Dr. Neil Bania**

September 15, 1997

*Introduction* [1]

Research has indicated that student success or failure in school is in large part a function of a variety of student and family background characteristics such as socioeconomic status, individual health, and family structure. In order to assist the other experts in this case in assessing the impact of these variables on students in the affected class, this report analyzes the demographic characteristics most likely to affect the success and behavior of students enrolled in the Cleveland Public School District.

### *Methodology*

The conclusions reported in this paper are based upon an examination of the status of blacks and whites on a wide range of demographic variables that have been identified in the literature as having an effect on student achievement. To the extent that such differences exist, they provide a measure of the difficulty the Cleveland Public Schools face in educating members of the plaintiff class.

This report is organized as follows: A summary of the data is reported in a series of tables (Tables 1 through 11) on page 2 and 3. Next, the report provides a discussion of the findings reported in the summary tables, followed by a description of the sources of data used in this report. Finally, the appendix of the report contains the data in the summary tables reported in both tabular form and graphical (i.e. vertical bar charts) form.

### SUMMARY TABLE
### CLEVELAND SCHOOL DISTRICT, OHIO, UNITED STATES

| | CLEVELAND SCHOOL DISTRICT | OHIO | UNITED STATES |
|---|---|---|---|
| *Table 1:* Percent persons 25 and over lacking high school diploma (25+), 1990 | | | |
| White | 38.2 | 23.1 | 22.1 |
| Black | 44.8 | 35.4 | 36.9 |
| *Table 2:* Percent families with children in poverty, 1989 | | | |
| White | 25.1 | 11.7 | 10.5 |
| Black | 47.8 | 38.7 | 33.0 |
| *Table 3:* Percent households with income < $25,000, 1989 | | | |
| White | 57.0 | 41.2 | 39.2 |
| Black | 70.9 | 62.5 | 59.3 |
| *Table 4:* Percent households headed by a single parent, 1990 | | | |

1. Dr. Bania is a Senior Research Associate and Associate Director for Community Analysis at the Center on Urban Poverty and Social Change of the Mandel School of Applied Sciences at Case Western Reserve University. He has been compensated at the rate of $60 per hour, up to a maximum of $500 per day.

| | CLEVELAND SCHOOL DISTRICT | OHIO | UNITED STATES |
|---|---|---|---|
| White | 30.5 | 18.0 | 17.6 |
| Black | 69.0 | 59.7 | 53.2 |

*Table 5:* Percent persons 16 and older who are unemployed, 1990

| | CLEVELAND SCHOOL DISTRICT | OHIO | UNITED STATES |
|---|---|---|---|
| White Male | 10.0 | 6.0 | 5.3 |
| Black Male | 23.8 | 17.1 | 13.7 |
| White Female | 8.2 | 5.3 | 5.0 |
| Black Female | 18.0 | 13.6 | 12.2 |

*Table 6:* Percent Births to Single Mothers, 1993–1995

| | CLEVELAND SCHOOL DISTRICT | OHIO | UNITED STATES |
|---|---|---|---|
| White | 43.7 | 24.2 | n/a |
| Black | 84.6 | 76.6 | n/a |

*Table 7:* Percent Low Birth Weight Births (< 2500 grams ), 1993–1995

| | CLEVELAND SCHOOL DISTRICT | OHIO | UNITED STATES |
|---|---|---|---|
| White | 8.3 | 6.3 | n/a |
| Black | 16.0 | 13.3 | n/a |

*Table 8:* Percent persons receiving AFDC benefits, June 1997

| | CLEVELAND SCHOOL DISTRICT | OHIO | UNITED STATES |
|---|---|---|---|
| White | 5.8 | n/a | n/a |
| Black | 24.5 | n/a | n/a |

*Table 9:* Teen Fertility Rates Per 1000, 1993–1995

| | CLEVELAND SCHOOL DISTRICT | OHIO | UNITED STATES |
|---|---|---|---|
| White | 45.8 | n/a | n/a |
| Black | 65.8 | n/a | n/a |

*Table 10:* Infant Mortality Rates Per 1000, 1993–1995

| | CLEVELAND SCHOOL DISTRICT | OHIO | UNITED STATES |
|---|---|---|---|
| White | 10.6 | n/a | n/a |
| Black | 21.5 | n/a | n/a |

*Table 11:* Arrest Rates for Adults (18+) Per 1000, 1996

| | CLEVELAND SCHOOL DISTRICT | OHIO | UNITED STATES |
|---|---|---|---|
| White Male | 32.5 | n/a | n/a |
| Black Male | 136.8 | n/a | n/a |
| White Female | 6.9 | n/a | n/a |
| Black Female | 18.1 | n/a | n/a |
| White | 19.0 | | |
| Black | 69.0 | | |
| White & Black Male | 76.8 | n/a | n/a |
| White & Black Female | 12.2 | n/a | n/a |
| White & Black | 41.5 | n/a | n/a |

n/a—not available

## TABLE SUMMARIES

**Table 1:** *Percent Persons aged 25 and over lacking a high school diploma, 1990*

Among those aged 25 and over, more black persons than white persons lack a high school diploma in the Cleveland School District desegregation area. Nearly forty-five percent (44.8%) of black persons aged 25 and over lack a high school diploma, while thirty-eight percent (38.2%) of white persons aged 25 and over do not have a diploma. The percentages of those lacking a high school diploma for both racial groups are greater in the desegregation area than in Ohio or the nation. In Ohio, 35.4% of blacks and 23.1% of whites lack a high school diploma. In the nation, 36.9% of black persons and 22.1% of white persons lack a high school diploma. The educational gap between black and white persons is larger in Ohio and the nation as a whole than in the desegregation area. The percentage point difference between black persons and white persons lacking a high school diploma in the desegregation area is 6.6 compared to 12.3 in Ohio and 14.8 in the nation.

**Table 2:** *Percent Families with children in poverty, 1989*

In the desegregation area, 47.8% of the black families with children live in poverty. In comparison, a quarter (25.1%) of the white families with children live in poverty. In Ohio, 38.7% of black families with children live in poverty compared to 11.7% of white families with children. Thirty-three percent (33.0%) of the nation's black families with children live in poverty compared to 10 .5% of white families with children. The gap between the percent of black families with children living in poverty and the percent of white families with children living in poverty is 22.7 percentage points in the desegregation area, compared to 27.0 in Ohio and 22.5 in the nation.

**Table 3:** *Percent Households with income under $25,000, 1989*

Black households with incomes of under $25,000 comprise 70.9% of all black households in the desegregation area. In comparison, 57.0% of all white households have incomes of less than $25,000 in the desegregation area. The percentages in Ohio and the nation are lower than those in the desegregation area for both racial groups. Sixty-two and one-half percent (62.5%) of the black households in Ohio have an income of less than $25,000 compared to 41.2% of the white households in this income category. In the nation, 59.3% of black households and 39.2% of the white households have an income of less than $25,000. The percentage difference between the racial groups is greater in Ohio and the nation than in the desegregation area. The difference in the desegregation area is 13.9 percentage points compared to 21.3 in Ohio and 20.1 in the nation.

**Table 4:** *Percent households with headed by a single parent, 1990*

In the desegregation area, sixty-nine percent (69.0%) of the black households are headed by a single parent. In comparison, thirty and one-half percent (30.5%) of the white households are headed by a single parent. The percentage of households headed by a single parent for both racial categories is greater in the desegregation area than Ohio or the nation as a whole. In Ohio, 59.7% of the black households and 18.0% of the white households are headed by a single parent. Fifty-three percent (53.2%) of the black households and 17.6% of the white households are headed by a single parent in the nation. The difference in the percentage of black and white households headed by a single parent is greatest in Ohio (41.7 percentage points), followed by the desegregation area (38.5 percentage points) and the nation (35.6 percentage points).

**Table 5:** *Percent Persons 16 and older who are unemployed, 1990*

Among black males aged 16 and over, 23.8% are unemployed compared to 10.0% of the white males aged 16 and older in the desegregation area. Eighteen percent (18.0%) of the black females aged 16 and older are unemployed compared to 8.2% of their white counterparts in the desegregation area. The percentage of males and females by racial group who are unemployed is great-

er in the desegregation area than Ohio or the nation. In Ohio, 17.1% of black males, 6.0% of white males, 13.6% of black females and 5.3% of white females aged 16 and older are unemployed. In the nation, 13.7% of black males, 5.3% of white males, 12.2% of black females and 5.0% of white females aged 16 and older are unemployed. The percentage gap between the racial and gender groups is greater in the desegregation area than either Ohio or the nation. The percentage gap between black and white males is 13.8 percentage points in the desegregation area, 11.1 percentage points in Ohio and 8.4 percentage points in the nation. For the females, the racial gap is 9.8 percentage points in the desegregation area, 8.3 percentage points in Ohio and 7.2 percentage points in the nation.

**Table 6:** *Percent Births to Single Mothers, 1993–1995*

A three year average was used for this measure because the annual occurrences of these events are relatively infrequent and subject to random variation. On average, in the three year period, 84.6% of births to black mothers were to single mothers compared to 43.7% percent of births to single white mothers. In Ohio, 76.6% of the births to black mothers were to single black mothers compared to 24.2% of the births to single white mothers during the three year period. The percentage difference between births to single black mothers and births to single white mothers is greater in Ohio than in the desegregation area. In Ohio, the percentage point difference between births to single black mothers and births to single white mothers is 52.4 compared to 40.9 in the desegregation area.

**Table 7:** *Percent Low Birth Weight Births (< 2500 grams), 1993–1995*

A three year average was used for this measure because the annual occurrences of these events are relatively infrequent and subject to random variation. Sixteen percent (16.0%) of the black mothers compared to 8.3% of white mothers gave birth to a low birth weight infant in the desegregation area. In Ohio, 13.3% of the black mothers and 6.3% of the white mothers gave birth to low birth weight infants. The percentage gap between

black and white mothers was greater in the desegregation area than in Ohio, 7.7 percentage points and 7.0 percentage points, respectively.

**Table 8:** *Percent Persons receiving AFDC benefits, June 1997*

Twenty-four and one-half percent (24.5%) of the black persons in the desegregation area received Aid to Families with Dependent Children (AFDC) compared to 5.8% of the white persons in this area.

**Table 9:** *Teenage Fertility Rates per 1000, 1993–1995*

A three year average was used for this measure because the annual occurrences of these events are relatively infrequent and subject to random variation. The teenage fertility rate is calculated as the number of births to teen females aged 10–19 per 1000 females in this age group. The teen births are an average of the three years (1993–1995). The population used to calculate the rate is the 1990 teen female population from the Census. In the desegregation area, the teenage fertility rate for black females averaged 65.8 per 1000 compared to 45.8 per 1000 for white females during the three year period.

**Table 10:** *Infant mortality rate per 1000, 1993–1995*

A three year average was used for this measure because the annual occurrences of these events are relatively infrequent and subject to random variation. The infant mortality rate is calculated as the number of infant deaths per 1000 live births. During the three year period, the infant mortality rate for blacks, on average, was 21.5 per 1000 compared to 10.6 per 1000 for whites in the desegregation area.

**Table 11:** *Arrest Rate of Adults (Aged 18+) per 1000 (1996)*

The adult arrest rate is calculated as the number of arrests of those aged 18 and over per 1000 population of this same age group. The arrests are based on 1996 arrest records. The population used to calculate the rate is the 1990 population from the Census. The arrest rate for black males aged 18 and over is 136.8 per 1000 compared to 32.5 per 1000

for white males in the desegregation area. The arrest rate for black females is 18.1 per 1000 compared to 6.9 per 1000 for white females in this area. The arrest rate is 76.8 per 1000 for males (black and white) and 12.2 per 1000 for females (black and white) in the desegregation area. The arrest rates for blacks is 69.0 per 1000 compared to 19.0 per 1000 for whites. The arrest rate for both blacks and whites is 41.5 per 1000.

## SOURCES OF DATA

The data contained in Tables 1 through 5 were derived from the U.S. Bureau of the Census, 1990 Summary Tape File 3A (STF3A). This data file contains numerous tables describing the population and housing characteristics for a variety of geographic levels within the United States.

The data contained in Tables 6 & 7 were derived from two data sources. The data regarding the Cleveland City School District was derived from birth certificates obtained through the Ohio Department of Health. The data regarding Ohio was obtained through *1994/1995 Vital Statistics Annual Report, The Ohio Department of Health.* The data in these tables are based on the three years, therefore, the percentages are three year averages.

The data contained in Table 8 were derived from two sources. The ADC data was obtained from the Cuyahoga County Department of Entitlement Services program participation files. The population data were derived from the U.S. Bureau of the Census, 1990 Summary Tape File 3A (STF3A).

The data contained in Table 9 were derived from two sources. The teen births were derived birth certificates obtained through the Ohio Department of Health. The teen population data were derived from the U.S. Bureau of the Census, 1990 Summary Tape File 3A (STF3A). The teenage fertility rates are based on the average number of births to teens during a three year period (1993–1995).

The data contained in Table 10 were derived from two sources. The infant deaths were derived from death certificates obtained through the Ohio Department of Health. The live births were derived from birth certificates obtained through the Ohio Department of Health. The infant mortality rates are based on the average number of infant deaths during a three year period (1993–1995).

The data contained in Table 11 were derived from two sources. The 1996 arrest records were obtained from the Cleveland Police Department, Crime Analysis Unit. The 1990 population were derived from the U.S. Bureau of the Census, 1990 Summary Tape File 3A (STF3A).

## Table 1: Percent Persons Lacking a High School Diploma (Aged 25+), 1990

| | Cleveland School District | Ohio | United States |
|---|---|---|---|
| White | 38 2 | 23.1 | 22.1 |
| Black | 44.8 | 35.4 | 36.9 |

**Percent persons lacking high school diploma (25+)**

## Table 2: Percent Families with Children in Poverty, 1989

| | Cleveland School District | Ohio | United States |
|---|---|---|---|
| White | 25.1 | 11.7 | 10.5 |
| Black | 47.8 | 38.7 | 33.0 |

**Percent Families with Children in Poverty**

Source: U.S. Bureau of the Census, 1990 Summary Tape File 3A (STF3A)

## Table 3: Percent Households with Income < $25,000, 1989

| | Cleveland School District | Ohio | United States |
|--------|---------------------------|------|---------------|
| White | 57.0 | 41.2 | 39.2 |
| Black | 70.9 | 62.5 | 59.3 |

### Percent households with income < $25,000

## Table 4: Percent Households Headed by a Single Parent, 1990

| | Cleveland School District | Ohio | United States |
|--------|---------------------------|------|---------------|
| White | 30.5 | 18.0 | 17.6 |
| Black | 69.0 | 59.7 | 53.2 |

### Percent households headed by a single parent

Source: U.S. Bureau of the Census, 1990 Summary Tape File 3A (STF3A)

## Table 5: Percent Persons 16+ Unemployed, 1990

| | Cleveland School District | Ohio | United States |
|---|---|---|---|
| White Male | 10.0 | 6.0 | 5.3 |
| Black Male | 23.8 | 17.1 | 13.7 |
| White Female | 8.2 | 5.3 | 5.0 |
| Black Female | 18.0 | 13.6 | 12.2 |

**Percent Persons Unemployed (16+)**

Source: U.S. Bureau of the Census, 1990 Summary Tape File 3A (STF3A)

## Table 6: Percent Births to Single Mothers
### (1993-1995)

| | Cleveland School District | Ohio | United States |
|---|---|---|---|
| White | 43.7 | 24.2 | n/a |
| Black | 84.6 | 76.6 | n/a |

### Percent Births to Single Mothers

## Table 7: Percent Low Birth Weight Births
### (1993-1995)

| | Cleveland School District | Ohio | United States |
|---|---|---|---|
| White | 8.3 | 6.3 | n/a |
| Black | 16.0 | 13.3 | n/a |

### Percent Low Birth Weight Births

Source: Ohio Department of Health

## Table 8: Percent Persons Receiving AFDC Benefits
### (June 1997)

| | Cleveland School District | Ohio | United States |
|---|---|---|---|
| White | 5.8 | n/a | n/a |
| Black | 24.5 | n/a | n/a |

**Percent persons receiving AFDC benefits**

Source1: Cuyahoga County Department of Entitlement Services
Source2: U.S. Bureau of the Census, 1990 Summary Tape File 3A (STF3A)

## Table 9: Teenage Fertility Rates Per 1000
### (1993-1995)

| | Cleveland School District | Ohio | United States |
|---|---|---|---|
| White | 45.8 | n/a | n/a |
| Black | 65.8 | n/a | n/a |

**Teenage Fertility Rates***

\* Teenage fertility rate is defined as the number of births to teen females aged 10-19 per 1000 females in the same age group

## Table 10: Infant Mortality Rates Per 1000
### (1993-1995)

| | Cleveland School District | Ohio | United States |
|---|---|---|---|
| White | 10.6 | n/a | n/a |
| Black | 21.5 | n/a | n/a |

**Infant Mortality Rates****

\*\* Infant mortality is defined as the number of infant deaths per 1000 live births

Source1: Ohio Department of Health
Source2: U.S. Bureau of the Census, Summary Tape File 3A (STF3A)

Table 11: Arrest Rates for Adults (18+) Per 1000, 1996

| | Cleveland School District | Ohio | United States |
|---|---|---|---|
| White Male | 32.5 | n/a | n/a |
| Black Male | 136.8 | n/a | n/a |
| White Female | 6.9 | n/a | n/a |
| Black Female | 18.1 | n/a | n/a |
| White | 19.0 | n/a | n/a |
| Black | 69.0 | n/a | n/a |
| White & Black Male | 76.8 | n/a | n/a |
| White & Black Female | 12.2 | n/a | n/a |
| White & Black | 41.5 | n/a | n/a |

**Arrests Rates for Adults (18+)**

Legend:
- □ White Male
- ■ Black Male
- ■ White Female
- ■ Black Female
- ▨ White
- ▨ Black
- ▤ White & Black Male
- ■ White & Black Female
- ▥ White & Black

Source1: Cleveland Police Department, Crime Analysis Unit
Source2: U.S. Bureau of the Census, 1990 Summary Tape File 3A (STF3A)